ROBERTS, J.,
 

 for the Court:
 

 ¶ 1. Midday on October 24, 2007, Bonnie Brassel arrived at the home of William and Carolyn Garrett, her sister and brother-in-law, to celebrate Carolyn’s birthday. As she was about to enter the house she saw a
 
 *692
 
 man with a gun and screamed out. The Garretts heard the scream and opened the door. The assailant then pointed the gun at William and demanded money. William was able to slam the door. Unsure what to do, the would-be robber fled to his awaiting dark-brown truck. After the Garretts contacted law enforcement, Detective Mario Magsby noticed a brown truck and gave chase. The truck crashed into another vehicle, and the driver fled. However, the driver was soon found and identified as Dewayne Tugle. Tugle was later tried and convicted in the Circuit Court of Coahoma County of attempted armed robbery, felon in possession of a weapon, and felony fleeing. Tugle now appeals.
 

 FACTS
 

 ¶2. On October 24, 2007, at approximately 11:00 a.m., Brassel pulled into the driveway of the Garretts’ home and pulled around to the back of the house. She testified that she noticed an unoccupied dark-brown, older-model truck with light colors on it. During the ensuing investigation, she identified the truck Tugle was driving as the truck she saw that day. As she walked toward the back door a man appeared from around the house with a gun and approached her. Brassel estimated that the man was ten feet away when she first saw him. Brassel described the man as a black male having a bald head, a beard, and wearing a light-colored sweatshirt. She further described the gun as light-colored. Brassel testified that at this point William opened the back door, and Brassel ran in the opposite direction.
 

 ¶ 8. She testified that she was not able to identify Tugle from a photographic lineup shown to her the afternoon of October 24th. Brassel explained that she was unable to make an identification because the pictures were blurry, and she did not have her reading glasses when she looked at the array. At trial, Brassel identified Tugle as the man with the gun she saw in the Garretts’ yard on October 24th. She stated, “at the moment that I saw [Tugle] when we came in here, I just knew it was him.”
 

 ¶4. Carolyn was the next to testify. She stated that she, William, Brassel, and others planned to eat lunch together to celebrate her birthday. Carolyn stated that on the day of the attempted robbery William indicated that Brassel was at the house, and Carolyn went to the kitchen to greet her. Once there, Carolyn heard a loud scream. She and William thought that a dog had scared Brassel, so William opened the door. However, William immediately tried to close the door. Carolyn also testified that someone was trying to kick the door open, but William finally managed to shut it and apply the dead-bolt lock after three attempts. Carolyn then testified that William proclaimed: “[H]e’s got a gun. He’s got a gun. Go get the gun.” Carolyn stated that once William locked the door, she saw a man in the kitchen window approximately six to eight feet away from her hesitate before running off. Carolyn stated that she did not get a good look at him but that he was a black man, heavyset, wearing a light-colored sweatshirt. Once he ran off, Carolyn went outside to check on her sister and saw the man running toward a dark-brown truck parked next door. She then ran back inside with Brassel and called the police as she and William looked out of the front window and saw the dark-brown truck drive away.
 

 ¶ 5. Carolyn was later shown a photographic lineup containing a picture of Tu-gle, but she was unable to identify him. She testified that she later identified the dark-brown truck Tugle was driving when he crashed as the truck she saw the assail
 
 *693
 
 ant drive away from her home. However, on cross-examination, she testified that she could not be sure that it was the same truck, but it looked exactly like the one she had seen at her house.
 

 ¶ 6. Detective Magsby testified that he worked for the Coahoma County Sheriffs Department and received a call from that indicated that an attempted robbery had taken place. The description of the perpetrator was a black male, with a beard, a bald head, and wearing a light-colored sweatshirt who left the scene of the crime in a dark-colored pickup truck. On his way to the Garretts’ home, Detective Magsby passed a truck that matched the description given. He observed that the truck failed to make a complete stop at a stop sign. Additionally, the driver’s actions of continuously looking at Detective Magsby’s unmarked patrol car raised Detective Magsby’s suspicions. He noted that the driver had on a white t-shirt and red baseball cap. Detective Magsby turned around, got behind the truck, and called in the license-plate number. Mags-by then activated his vehicle’s blue lights, which were mounted on the interior dashboard. The truck initially slowed as if to stop, but suddenly, it sped up. At this point, Detective Magsby turned on the unmarked patrol car’s siren. The driver momentarily lost control and nearly hit a utility pole, but the truck continued to evade Detective Magsby.
 

 ¶ 7. Detective Magsby testified that it was raining, and he estimated the truck’s speed at thirty-five to forty miles an hour. During the chase, the driver of the truck lost control of the vehicle several times. Detective Magsby also stated that there were other cars and traffic on the road during the chase. Detective Magsby testified that upon approaching one intersection, the truck bypassed it by driving through an adjacent parking lot. Soon after, the truck lost control for the last time and collided with a parked car. The driver exited the truck and started running.
 

 ¶ 8. Although he was momentarily stuck in traffic, Detective Magsby gave chase. However, he lost sight of the driver. Another detective showed up on the scene, and the two detectives began searching the area. Walking past where he last saw the driver, Detective Magsby found a white t-shirt and red baseball cap on the ground. A few moments later Detective Magsby saw a black man with a bald head and no shirt running down an adjacent alleyway. A short chase ensued before additional law-enforcement officers arrived and the driver, who was Tugle, was apprehended.
 

 ¶ 9. Once Tugle was in custody, Detective Magsby went back to the scene of the crash. In the truck he found Tugle’s wallet and a light-colored sweatshirt on the backseat. A gun case was also found within a block of the crash. The gun case contained a loaded .38-caliber pistol. Detective Magsby learned that the pistol and truck belonged to John Tugle, who is Tu-gle’s uncle. Detective Magsby identified Tugle as the driver of the truck.
 

 ¶ 10. Detective Magsby testified that he later went to the Garretts’ home and showed William, Carolyn, and Brassel a photographic lineup containing Tugle’s picture. However, no one could make a positive identification of Tugle. On cross-examination, Detective Magsby stated that William actually picked a photograph that was not Tugle.
 

 ¶ 11. On cross-examination, Detective Magsby testified that he could not see if Tugle was carrying anything when he exited the truck. Detective Magsby also stated that no fingerprints were found on the pistol, gun case, or any of the bullets recovered. Additionally, Tugle’s defense attorney pointed out that the date on the
 
 *694
 
 printout resulting from Detective Mags-by’s calling in the truck’s license-plate number was dated the day before the attempted robbery. However, Detective Magsby stated that it must have been a typo.
 

 ¶ 12. William was the last witness for the State. He testified that he opened the door to let Brassel inside and there was a man at the bottom of the steps with a gun in one hand, which was pointed at William, and a small stick in the other. William testified that the man with the gun told him to give him money. William immediately tried to shut the door, but the armed man tried to push his way inside. William testified that he pushed the armed man out of the house with the door and locked it behind him. William stated that once the armed man left, he looked out of the window and saw a dark-colored truck drive away. William stated that he “was scared to death.”
 

 ¶ 13. William described the gun as a .38 or .32-caliber, short-barreled, light-colored “revolver.” He identified the gun that was found in the blue gun case as the gun that was pointed at him. He described the man that pointed the gun at him as a black male, with a bald head, and a beard. William also stated that the light-colored sweatshirt that was found on the backseat of the wrecked truck was the shirt that the attempted robber had been wearing. When asked about his misidentification when shown the photographic lineup by Detective Magsby, William explained that the photograph he had selected was his best guess that day as to the picture of the attempted robber. However, William identified Tugle in court as the person who had tried to rob him.
 

 ¶ 14. Ruthie Lott was the defense’s first witness. She was the owner of the vehicle that Tugle crashed into. She testified that she heard the crash and looked outside. She saw Tugle exiting the truck. Lott testified that she saw Tugle immediately after the crash, and she did not see a blue gun case or gun.
 

 ¶ 15. Tugle’s mother and uncle testified on his behalf. John, Tugle’s uncle, testified that the truck and gun were his and that he had let Theresa, Tugle’s mother, borrow them. Theresa testified that she placed the gun and gun case underneath the truck seat. However, Theresa stated that she did not tell Tugle that the gun was in the truck. She further stated that she was working at the time of the attempted robbery.
 

 ¶ 16. Dawn Holmes testified that she and Tugle were members at the same church. She stated that she spoke with Tugle the day of the attempted robbery at 10:49 or 10:50 a.m., and the call lasted seventeen minutes. During cross-examination, she stated that the reason she was so sure of the time and length of the call was because it was lunch time.
 

 ¶ 17. Tugle took the stand and testified in his own defense. He testified that he was a convicted felon, but he denied attempting to rob anyone. When asked about the car chase, Tugle stated that he saw a black car behind him and a patrol car behind the black car. He believed the patrol car wanted the black car to stop. Tugle testified that he never saw Detective Magsby’s blue lights and was not trying to elude Detective Magsby. Tugle further stated that he had never seen the gun that was found. Tugle testified that he never lost control of his vehicle prior to crashing into Lott’s car. Tugle stated that after the crash, he was dazed, and his head was bleeding. He claimed he took his shirt off and held it to his head. Tugle testified that his cellular phone billing report showed that he had spoken with Holmes and corroborated Holmes’s testimony.
 

 ¶ 18. During cross-examination, Tugle stated that at the time Detective Magsby was behind him, he was heading to his
 
 *695
 
 mother’s house. Tugle testified he was wearing a white t-shirt, red skull-cap, and pajama pants. Tugle stated that he ran after the crash because he did not want to go to jail for not having car insurance. As a rebuttal witness, Detective Magsby held up the white t-shirt that was found during the search for Tugle. Detective Magsby noted that the t-shirt did not have any blood on it.
 

 PROCEDURAL HISTORY
 

 ¶ 19. Tugle was indicted on four counts. Counts I and II alleged that Tugle had attempted to arm rob William and Carolyn, respectively. Count III alleged that Tugle was a felon in possession of a weapon. And Count IV alleged that pursuant to Mississippi Code Annotated section 97-9-72 (Rev.2006), Tugle operated his vehicle in a reckless manner when he failed to come to a stop after being given a signal to stop from a law-enforcement officer who had reasonable suspicion that Tugle had committed a crime. Following the State’s case-in-chief, the trial court granted Tu-gle’s motion for direct verdict as to Count II, but the court allowed the case to proceed on Counts I, III, and IV. The jury subsequently returned guilty verdicts on all three remaining counts. The trial court sentenced Tugle to twenty-four years in the custody of the Mississippi Department of Corrections for Count I, eight years for Count III, and five years for Count IV, with the sentence in Count I to run consecutively to the sentence in Count III, the sentence in Count III to run consecutively with Count I, and the sentence in Count IV to run concurrently with Count I and Count III. Tugle now appeals.
 

 DISCUSSION
 

 I. IDENTIFICATION JURY INSTRUCTION
 

 ¶20. Tugle argues that the trial court erred in refusing proposed jury instruction D-2 on identification, which stated:
 

 The Court instructs the Jury that in reaching your verdict you are to consider all of the evidence concerning the entire case and the circumstances surrounding the crime. One of the issues in this case is the identification of DEWAYNE TUGLE as the perpetrator of the crime. As with each element of the crime charged, the State has the burden of proving identity beyond a reasonable doubt, and before you may convict DEWAYNE TUGLE you must be satisfied beyond a reasonable doubt of the accuracy of the identification of DEWAYNE TUGLE. If, after considering all of the evidence concerning the crime and the witnesses] identification of DEWAYNE TUGLE as the person who committed the crime, you are not convinced beyond a reasonable doubt that he is the person who committed the crime, then you must find him not guilty.
 

 Identification testimony is an expression of belief or impression by the witness. You must judge its value and reliability from the totality of the circumstances surrounding the crime and the subsequent identification. In appraising the identification testimony of a witness, you should consider the following:
 

 1) Did the witness have an adequate opportunity to observe the offender?
 

 2) Did the witness observe the offender with an adequate degree of attention?
 

 3) Did the witness provide an accurate description of the offender after the crime?
 

 4) How certain is the witness of the identification?
 

 5) How much time passed between the crime and the identification?
 

 
 *696
 
 If, after examining all of the testimony and the evidence, you have a reasonable doubt that DEWAYNE TUGLE was the person who committed the crime, then you must find DEWAYNE TUGLE not guilty.
 

 ¶ 21. Tugle concedes that a trial court is required to give such an instruction, if requested, when “the identification of the accused rests entirely upon the testimony of a single witness.”
 
 Thomas v. State,
 
 766 So.2d 809, 811 (¶ 8) (Miss.Ct.App. 2000). However, Tugle argues that because his convictions relied upon the testimony and identification of witnesses who had previously failed to identify him as the perpetrator, and in fact identified other individuals, he was entitled to have the jury instructed with jury instruction D-2.
 

 ¶ 22. Jury instruction D-2 was approved by the Mississippi Supreme Court in
 
 Davis v. State,
 
 568 So.2d 277, 280 (Miss.1990). However, as stated above, a defendant is only entitled to such an instruction if requested and if he is identified as the guilty party by, at most, one witness to his alleged crime.
 
 Warren v. State,
 
 709 So.2d 415, 421 (¶ 28) (Miss.1998). Although it is true that William and Brassel failed to correctly identify him prior to trial, they did in fact testify that Tugle was the individual who had attempted to arm rob them. Further, through cross-examination, the jury was made aware of William’s pretrial misidentification. As such, we find that the trial court did not err in refusing jury instruction D-2. This issue lacks merit.
 

 II. LATE DISCOVERY
 

 ¶ 23. Brassel failed to identify Tugle in a pretrial photographic lineup, and she did not identify him at court during Tu-gle’s first trial. However, she did make an in-court identification at his second trial. Tugle objected and argued that Bras-sel’s identification amounts to a discovery violation. At the conclusion of the subsequent bench conference, the trial court initially sustained the objection. However, the trial court asked Tugle’s defense counsel what he required to cure the discovery violation, and a transcript of Bras-sel’s testimony during Tugle’s first trial was requested. The trial court arranged for Tugle’s defense counsel to received the transcript by the end of the day, which was Monday, August 17, 2009. The trial court also continued the trial until Wednesday morning in order to give Tu-gle’s defense counsel an adequate amount of time to review the transcript.
 

 ¶ 24. Wednesday morning, Tugle’s trial resumed. Tugle’s defense counsel stated that he still objected to Brassel’s identifying Tugle in court. However, he abandoned the objection based upon a discovery violation and argued Brassel’s identification would be unfairly prejudicial given the fact that Brassel could not identify Tugle at the time of the crime or during Tugle’s first trial. The prosecutor explained that although Brassel could not identify Tugle from a photographic lineup shortly after the commission of the crime, Brassel told the prosecutor after Tugle’s first trial that after seeing Tugle in person, she was sure he was the individual who had tried to rob her and William. After hearing additional argument on the matter, the trial court noted that there was no longer an objection based upon a discovery violation and held that Tugle’s defense counsel’s current objection based upon prejudice was overruled as the trial court found the testimony to be more probative than prejudicial.
 

 ¶ 25. “In reviewing rulings of a trial court regarding matters of evidence, relevancy and discovery violations, the standard of review is abuse of discretion.”
 
 Montgomery v. State,
 
 891 So.2d 179, 182
 
 *697
 
 (¶ 6) (Miss.2004). The supreme court has enumerated the following procedures when a discovery violation is asserted before the trial court:
 

 1. Upon defense objection, the trial court should give the defendant a reasonable opportunity to become familiar with the undisclosed evidence by interviewing the witness, inspecting the physical evidence, etc.
 

 2. If, after this opportunity for familiarization, the defendant believes he may be prejudiced by lack of opportunity to prepare to meet the evidence, he must request a continuance. Failure to do so constitutes a waiver of the issue.
 

 3. If the defendant does request a continuance, the State may choose to proceed with trial and forego using the undisclosed evidence. If the State is not willing to proceed without the evidence, the trial court must grant the requested continuance.
 

 Randolph v. State,
 
 852 So.2d 547, 564 (¶ 52) (Miss.2002).
 

 ¶ 26. The court further stated:
 

 When the State fails to follow discovery procedures a reversal is not warranted in every case.
 
 Box v. State,
 
 437 So.2d [19] at 21 [ (Miss.1983) ]. This Court has held that a “[n]on-discovered evidence may be admitted at trial if the party against whom that evidence is offered is given a reasonable opportunity to make adequate accommodation.”
 
 Robinson v. State,
 
 508 So.2d 1067, 1071 (Miss.1987).
 

 Id.
 
 The trial court followed these guidelines and granted Tugle’s defense counsel time to review Brassel’s former testimony. Additionally, Tugle’s defense attorney effectively abandoned his objection based upon the prosecution’s alleged discovery violation. As such, we find this issue without merit.
 

 III. WEIGHT OF THE EVIDENCE
 

 ¶ 27. Tugle argues that his convictions for attempted armed robbery and felon in possession of a firearm were not supported by the weight of the evidence. In
 
 Wilkins v. State,
 
 1 So.3d 850, 854 (¶ 11) (Miss.2008), the supreme court held:
 

 A motion for new trial challenges the weight of the evidence. A reversal is warranted only if the trial court abused its discretion in denying a motion for new trial.... [T]his Court set out the standard of review for weight of the evidence, stating:
 

 when reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. We have stated that on a motion for new trial:
 

 ... The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.
 

 The evidence should be weighed in the light most favorable to the verdict.
 

 (Internal citations omitted).
 

 ¶ 28. The jury was presented with testimony and evidence that Tugle: (1) attempted to feloniously take, (2) money from William, (3) against his will, (4) by putting William in fear of immediate injury by the exhibition of a deadly weapon,
 
 i.e.,
 
 the gun.
 
 See
 
 Miss.Code Ann. § 97-3-79 (Rev.2008). Further, Tugle admitted he was a prior-convicted felon.
 
 See
 
 Miss. Code Ann. § 97-37-5 (Supp.2009). We find that allowing the verdicts to stand will
 
 *698
 
 not sanction unconscionable injustice. This issue has no merit.
 

 IV. LEGAL SUFFICIENCY
 

 ¶ 29. Tugle argues that the evidence presented to the jury was lacking, as a matter of law, to sustain a conviction under Court IV, felony fleeing. The supreme court has stated:
 

 [T]he critical inquiry is whether the evidence shows “beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.”
 
 Carr v. State,
 
 208 So.2d 886, 889 (Miss.1968). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
 

 Stewart v. State,
 
 986 So.2d 304, 308 (¶ 12) (Miss.2008) (quoting
 
 Jones v. State,
 
 904 So.2d 149, 153-54 (¶ 12) (Miss.2005)).
 

 ¶30. Under Count IV, Tugle was alleged to have violated Mississippi Code Annotated section 97-9-72. According to section 97-9-72(1):
 

 The driver of a motor vehicle who is given a visible or audible signal by a law enforcement officer by hand, voice, emergency light or siren directing the driver to bring his motor vehicle to a stop when such signal is given by a law enforcement officer acting in the lawful performance of duty who has a reasonable suspicion to believe that the driver in question has committed a crime, and who willfully fails to obey such direction shall be guilty of a misdemeanor....
 

 However, section 97-9-72(2) enhances the punishment when, “[a]ny person ... by operating a motor vehicle in such a manner as to indicate a reckless or willful disregard for the safety of persons or property, or who so operates a motor vehicle in a manner manifesting extreme indifference to the value of human life.... ” The only evidence of the chase came from the testimonies of Detective Magsby and Tugle. We find that Tugle’s actions satisfy the elements above and that the evidence presented was legally sufficient to support the conviction for Count IV. As such, this issue is without merit.
 

 ¶ 31. THE JUDGMENT OF THE CIRCUIT COURT OF COAHOMA COUNTY OF CONVICTION OF COUNT I, ATTEMPTED ARMED ROBBERY, AND SENTENCE OF TWENTY-FOUR YEARS TO RUN CONSECUTIVELY TO THE SENTENCE IN COUNT III AND CONCURRENTLY WITH THE SENTENCE IN COUNT IV; COUNT III, FELON IN POSSESSION OF A FIREARM, AND SENTENCE OF EIGHT YEARS TO RUN CONSECUTIVELY TO THE SENTENCE IN COUNT I AND CONCURRENTLY WITH THE SENTENCE IN COUNT IV; AND COUNT IV, FELONY FLEEING, AND SENTENCE OF FIVE YEARS TO RUN CONCURRENTLY WITH THE SENTENCES IN COUNTS I AND III, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEALS ARE ASSESSED TO COAHOMA COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, CARLTON AND MAXWELL, JJ., CONCUR.