ROBERTS, J.,
for the Court:
¶ 1. A jury sitting before the Hinds County Circuit Court found Randy Johnson guilty of murder, four counts of aggravated assault, and shooting into an occupied dwelling. The circuit court sentenced Johnson to life for murder, ten years for each count of aggravated assault, and five years for shooting into an occupied dwelling, with all sentences to run consecutively to one another in the custody of the Mississippi Department of Corrections (MDOC) for a total sentence of life plus forty-five years.
¶2. Aggrieved, Johnson appeals and raises the following six issues: (1) the circuit court erred when it held that an audio recording was inadmissible; (2) the prosecution made improper comments during closing arguments; (3) the prosecution committed a discovery violation by failing to disclose a written statement; (4) the circuit court erred when it prohibited Johnson from cross-examining an expert witness regarding a firearm that was found near the scene of the crime; (5) the prosecution failed to prove conspiracy beyond a reasonable doubt; and (6) the cumulative effect of the errors requires this to Court reverse the judgments of conviction and remand this matter for a new trial. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 3. Johnson’s conviction stems from events that occurred on the evening of May 26, 2008, at Phyllis Adams’s house on 302 Manship Street, Jackson, Mississippi. *634 Although Adams did not intend to have a party that day, a number of people had gathered at her house. Melvin Parker shot Terrence Lampkin with a paintball gun. Lampkin retaliated by shoving Parker. Parker accidentally knocked over Charlie Taylor’s drink. As a result, Taylor and Lampkin argued. Other people in attendance separated them. Taylor left Adams’s property. . On his way out, he warned others at Adams’s house that they had better be gone by the time he returned.
¶ 4. Shortly afterward, Johnson picked up Taylor. What happened next was disputed at trial. Viewed in the light most favorable to the jury’s verdicts, Johnson drove Taylor to James Warren Jr.’s house. Johnson told Warren that he needed some guns because of a dispute with some “boys on north end.” Joseph Bennett was also at Warren’s house. Bennett went behind an abandoned house and got what has been described as an “assault rifle.” Bennett then left with Johnson and Taylor, and Johnson drove to Adams’s house. When Bennett got out of Johnson’s ear, Bennett was armed with the “assault rifle.”
¶ 5. Johnson called Lampkin over to his car, where Lampkin and Taylor argued again. Eventually, Johnson told Lampkin to get away from his car. Lampkin complied. Bennett then exclaimed that he was “tired of’ the people at Adams’s house and began shooting. Bennett shot Cordarel Brown, Martez Samuel, Alexis England, Parker, and Lampkin. Bennett also shot Adams’s house. Johnson drove away. Warren, who had arrived between the time that Johnson arrived and Bennett started shooting, gave Bennett a ride and some money for a hotel room. Samuel, England, Parker, and Lampkin all survived. Brown, then eighteen years old, had been shot three times — once to the head, once to the neck, and once to the chest. Unfortunately, he was unable to recover from his wounds.
¶ 6. Officers with the Jackson Police Department’s Crime Scene Unit found twelve spent Remington .223-caliber bullet casings outside Adams’s house. Starks Hathcock, a firearms expert with the Mississippi Crime Laboratory, tested the spent bullet casings. He concluded that they were all fired from the same high-velocity semiautomatic rifle.
¶ 7. Dr. Stephen Hayne performed Brown’s autopsy. Dr. Hayne concluded that Brown died from two gunshot wounds — one to the right side of Brown’s neck and one to the right side of Brown’s chest. Dr. Hayne also concluded that the gunshot wound to Brown’s head would have been non-lethal on its own.
¶ 8. Johnson was arrested and indicted for murder, four counts of aggravated assault, and shooting into an occupied dwelling.[1] On February 2, 2010, Johnson went to trial. The prosecution’s first three witnesses, Parker, Samuels, and England, all testified regarding the events that occurred at Adams’s house. Adams testified briefly regarding her house being shot. Beatrice Blocker testified that Johnson and Taylor went to Warren’s house after Taylor left Adams’s house. According to Blocker, Johnson asked Warren for some guns. Blocker further testified that Bennett, who was also at Warren’s house, acquired an “assault rifle” and left with Johnson.
¶ 9. The prosecution also called three law-enforcement officers with the Jackson *635 Police Department: Officer Charles Taylor and Officer Robert Bufkin, who were both with the Jackson Police Department’s crime scene unit, and Sergeant Donald Gator, who responded and supervised the security of the crime scene until Officer Taylor arrived. Additionally, the prosecution called Dr. Hayne, who testified regarding Brown’s autopsy, and Hathcock, who testified that all of the spent shell casings were fired from the same weapon. The prosecution rested its case-in-chief after Hathcock testified. Following an unsuccessful motion for a directed verdict, Johnson called witnesses on his behalf.
¶ 10. Johnson called Sheena Dolly, who testified that she heard gunshots coming from somewhere other than Adams’s house. Next, Johnson called Da,nielle Tur-nage. Turnage testified that she also heard gunshots that came from somewhere other than Adams’s house. Additionally, Turnage testified that after Taylor and Lampkin argued, she called Johnson and asked him to get Taylor because she was concerned that the altercation between Taylor and Lampkin could become violent.
¶ 11. Johnson’s trial resumed the next morning. Johnson called Warren, who pled the Fifth Amendment in response to all questions. During Warren’s testimony, Johnson submitted a transcript of Warren’s guilty plea as an accessory-after-the-fact into evidence. During his guilty plea hearing, Warren stated that at approximately 9:45 or 10:00 p.m., he had been watching the feed from cameras that monitored the street in front of his home when he saw Johnson’s car pull up. Warren and Bennett, who was also at Warren’s house, went outside and asked Johnson why he was blocking the alley. Johnson told Warren that he “need[ed] some guns.” When Warren asked Johnson why he needed guns, Johnson answered, “I got two of— some boys on north end.” During his guilty-plea hearing, Warren explained that he told Johnson that he did not have anything to do with Johnson’s dispute. Consequently, Warren told Johnson to “[g]o get your own gun.” Warren went inside his house.
¶ 12. However, Bennett remained outside. Warren stated that he watched the video feed as Bennett went around a different house, returned, and got in the car with Johnson. Blocker came inside his house and said she had heard something about “some boys on north end.” Warren stated that he left his house intent on preventing any further altercations. He did not know exactly where Johnson, Taylor, and Bennett were going, so he drove around until his passenger, Milton Mi-chaels, saw Johnson’s car. By the time he made his way to Adams’s house, Bennett was out of Johnson’s car. After Bennett began firing at people, Johnson left him, so Bennett got into Warren’s vehicle. Warren went back to his house and told Bennett that he had to leave. Even so, Warren gave Bennett some money for a hotel room.
¶ 13. Next, Johnson recalled Blocker. Blocker reiterated that she did not know how Bennett got back to Warren’s house. After Blocker testified again, Johnson called Bennett as a witness. Bennett admitted that he had been convicted of murder, four counts of aggravated assault, and shooting into an occupied dwelling. Nevertheless, Bennett denied that he had shot anyone at Adams’s house. According to Bennett, Johnson and Taylor came by Warren’s house to pick him up so they could all go buy marijuana. He explained that they stopped at Adams’s house to talk to Lampkin. Bennett further testified that Warren arrived at Adams’s house after he, Johnson, and Taylor did. Bennett claimed that someone with Warren shot the victims.
*636 ¶ 14. Johnson rested after Bennett testified. The prosecution called David Domino as its sole rebuttal witness. At the time of the shootings, Domino was a detective with the Jackson Police Department. Detective Domino testified that he took Bennett’s written statement on June 3, 2008. According to Bennett’s statement, Johnson had been at Warren’s house looking for guns on the date of the shootings. On cross-examination, Johnson’s attorney noted that within his statement, Bennett had blamed someone else for the shootings. After Detective Domino testified, the prosecution rested. Other procedural matters will be discussed, as necessary, in the analysis portion of this opinion. As previously mentioned, the jury found Johnson guilty of murder, four counts of aggravated assault, and shooting into an occupied dwelling. Johnson appeals.
ANALYSIS
I. AUDIO RECORDING '
¶ 15. In this issue, Johnson claims the circuit court should have allowed him to play a clandestine audio recording that Johnson recorded on his cellular telephone. On the morning after the shootings, Johnson and Taylor met with Bennett in Bennett’s hotel room. Taylor and Bennett were unaware that Johnson recorded approximately three minutes of their conversation.
¶ 16. However, Johnson’s cellular telephone produced a very poor quality recording. Consequently, the circuit court granted Johnson’s motion for funds to have an expert, Jeffrey Reed of Taproot Audio Design, enhance the audio recordings. At trial, Johnson attempted to submit the enhanced audio recordings into evidence. The prosecution objected and argued that the enhanced audio recordings were inadmissible hearsay, and despite being enhanced, they were still unintelligible. The circuit judge listened to the enhanced audio recordings and concluded that they were inadmissible. According to the circuit judge, “in so many instances [the enhanced audio recordings were] garble[d], [the] voices were running together, [I] couldn’t tell who was saying what ... [a]nd it was so fast that it was just unintelligible.” The circuit judge also concluded that the recordings were inadmissible because they were hearsay. During a proffer, Johnson identified his, Taylor’s, and Bennett’s voices.
¶ 17. On appeal, Johnson claims the circuit court erred when it held the recordings were inadmissible. We are mindful the circuit judge “enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses this discretion so as to be prejudicial to the accused, the Court will not reverse this ruling.” Shaw v. State, 915 So.2d 442, 445 (¶ 8) (Miss.2005).
¶ 18. Recordings must be relevant and authentic before they can be admitted into evidence. Ragin v. State, 724 So.2d 901, 903 (¶ 3) (Miss.1998). “Relevant Evidence” means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. M.R.E. 401. The State argues the enhanced audio recordings are not relevant because they are unintelligible. We agree.
¶ 19. To be sure, “[t]he mere fact that portions of such a recording are inaudible does not render it per se inadmissible. The question is whether what can be heard has probative value within Rule 401.” Oatis v. State, 726 So.2d 1230, 1235 (¶ 25) (Miss.Ct.App.1998) (quoting Middlebrook v. State, 555 So.2d 1009, 1012 (Miss. 1990)). The enhanced audio recordings are represented in three tracks that are *637 each approximately one minute long. In other words, the enhanced audio recordings are approximately three minutes long. After carefully listening to the enhanced audio recordings numerous times, we cannot discern anything relevant to the charges that Johnson faced.
¶ 20. Johnson’s cellular telephone was not intended to capture clandestine conversations. The voices on the enhanced audio recordings are muffled, garbled, indistinct, and simply unintelligible. The voices in the enhanced audio recordings are also too fast to distinguish what is being said. At no point could we determine any specific references to the events that happened at Adams’s house — at least none that would have any tendency to make the existence of any fact that is of consequence more or less probable. Because the scant intelligible portions of the three-minute enhanced audio recordings do not tend to make any fact of consequence more or less probable, the enhanced audio recordings are irrelevant and, therefore, inadmissible. Accordingly, we find that the circuit judge did not abuse his discretion when he concluded that the enhanced audio recordings were inadmissible. It follows that we find no merit to this issue. Because the enhanced audio recordings were inadmissible because they were irrelevant, whether they constituted inadmissible hearsay is moot.
II. PROSECUTORIAL MISCONDUCT
¶ 21. In this issue, Johnson claims the prosecutor made improper remarks during closing arguments that attempted to shift the burden to Johnson. Specifically, Johnson takes issue with the prosecutor’s statement: “They haven’t showed you a shred of evidence of anything.” Johnson’s defense counsel objected. The circuit court then stated: “The jury disregard that last statement. The defendant is not required to prove anything.” Johnson argues this Court should reverse his conviction and render a judgment of acquittal or remand this matter for a new trial.
¶ 22. “[T]o determine whether a prosecutor’s closing remarks constitute reversible error, we review first whether the remarks were improper, and if so, whether the remarks prejudicially affected the accused’s rights.” Sanders v. State, 939 So.2d 842, 845 (¶ 9) (Miss.Ct.App.2006) (citing Spicer v. State, 921 So.2d 292, 318 (¶ 55) (Miss.2006)). “It must be clear beyond a reasonable doubt, that absent the prosecutor’s comments, the jury could have found the defendant guilty.” Id. “The standard used in reviewing closing arguments is ‘whether the natural and probable effect of the prosecuting attorney’s improper argument created unjust prejudice against the accused resulting in a decision influenced by prejudice.’ ” Id. (quoting Rushing v. State, 711 So.2d 450, 455 (¶ 15) (Miss.1998)). “The trial judge is in the best position to determine if an alleged objectionable remark has a prejudicial effect.” Id. at 846. “As we review the decision of the trial court regarding the admissibility of statements made in closing arguments, we keep in mind that counsel is allowed wide latitude when making their arguments to the jury; the trial court should show restraint in curtailing counsel’s arguments.” Id. “Any allegedly improper prosecutorial comments must be considered in the context and circumstances of the case.” Id. “This Court will not reverse a conviction unless we are convinced that the remark contributed to the verdict.” Huggins v. State, 911 So.2d 614, 619 (¶ 15) (Miss.Ct.App.2005).
¶ 23. We are not convinced that the prosecution’s remark contributed to the verdicts. It is true “[t]he burden of *638 proof in a criminal case never shifts from the State to the defendant.” Randall v. State, 806 So.2d 185, 211-12 (¶ 61) (Miss.2001). Even so, “it is not error to comment on the defense’s failure to offer any evidence whatsoever to counter or explain the [S]tate’s evidence.” Huggins, 911 So.2d at 619 (¶ 14). Furthermore, it is not improper for the prosecution to argue in closing that a defendant’s case is inadequate. Id.
¶24. The circuit court adequately instructed the jury regarding the prosecution’s burden of proof. That is, the circuit court instructed the jury that Johnson was presumed to be innocent, and the prosecution had the burden of proving every element beyond a reasonable doubt. The circuit court also instructed the jury that Johnson was not required to prove his innocence. What is more, the circuit court gave an adequate curative instruction after Johnson objected to the prosecution’s remark. Finally, as will be discussed below, there was substantial evidence to support the jury’s verdicts. Accordingly, we find no merit to this issue.
III. DISCOVERY VIOLATION
¶ 25. Next, Johnson claims that the circuit court erred when it denied his motion for a mistrial due to a discovery violation. Johnson filed an extremely comprehensive pretrial motion for discovery. Within his motion, Johnson requested “[cjopies of all written statements ... relevant in any way to the alleged crimes, made by any person, witness, or potential witness in connection with the alleged charges.”
¶ 26. During cross-examination of Bennett, the prosecution attempted to impeach Bennett with a letter that he wrote to Detective Domino. Specifically, the prosecution asked Bennett whether he had written a statement to Detective Domino in which Bennett stated that Johnson “asked for a gun.” At that time, Johnson’s attorney objected and stated that the prosecution had not provided him with Bennett’s statement during discovery. The prosecution responded that it had furnished a copy of Bennett’s statement to Johnson’s attorney, and even if it had not, it was not required to do so.
¶ 27. While the jury was out of the courtroom, the prosecution called Shaun Yurtkuran to the stand. Yurtkuran, a Hinds County assistant district attorney, testified that he never removed Bennett’s statement from the documents that were provided to Johnson’s attorney. Yurtku-ran also testified that Johnson’s attorney had been at the Hinds County District Attorney’s Office, and he had been offered an opportunity to review the evidence that the prosecution had in its file. However, Johnson’s attorney “had something to do at that time and [he] was going to look at it [at] a later time, but he didn’t look at it that day.” Yurtkuran was unaware whether Johnson’s attorney ever accepted the prosecution’s invitation to review its file. During cross-examination, Yurtkuran testified that Bennett’s statement was included in the documents that Yurtkuran gave to an administrative assistant to be sent to Johnson’s attorney. Yurtkuran admitted that he had not inspected the documents that Johnson’s attorney actually received.
¶ 28. The circuit court noted that Bennett was Johnson’s witness — not the prosecution’s. The circuit court further noted that the prosecution had not intended to call Bennett as a witness. Consequently, the circuit court stated, “there’s ... no reason to believe that there was any effort on the part of the [prosecution] to gain the substantial tactical advantage by this statement or any questioning about it.” The circuit court overruled Johnson’s objection. Johnson then moved for a mistri *639 al or, alternatively, a continuance. A significant discussion followed regarding the admissibility of Bennett’s statement. However, the circuit court never expressly ruled on Johnson’s motion for a mistrial or, alternatively, a continuance. The circuit court did note at one point in the discussion that at least an hour had lapsed since the jury had been excused from the courtroom to address the issue. On appeal, Johnson claims the circuit court should have granted his motion for a mistrial. We disagree.
¶ 29. “Whether to grant a motion for [a] mistrial is within the sound discretion of the trial court. The standard of review for denial of a motion for [a] mistrial is abuse of discretion.” Caston v. State, 823 So.2d 473, 492 (¶ 54) (Miss.2002) (citation omitted). Upon written request, the State is obligated to do the following:
disclose to each defendant or to defendant’s attorney, and permit the defendant or defendant’s attorney to inspect [and] copy ... [the] [n]ames and addresses of all witnesses in chief proposed to be offered by the prosecution at trial, together with a copy of the contents of any statement, written, recorded[,] or otherwise preserved of each such witness and the substance of any oral statement made by any such witness.
URCCC 9.04(A)(1). The prosecution did not intend to call Bennett during Johnson’s trial. Moreover, the prosecution did not call Bennett as a witness. Johnson did. Consequently, Rule 9.04(A)(1) did not obligate the prosecution to disclose Bennett’s prior inconsistent statement. Additionally, “[p]rior inconsistent statements used to impeach a witness need not be disclosed to opposing counsel unless opposing counsel has requested that such statements be disclosed.” Ross v. State, 954 So.2d 968, 999 (¶ 63) (Miss.2007) (citing M.R.E. 613(a)). Even so, Johnson’s attorney’s motion for discovery requested:
Copies of all written statements ... whether inculpatory or exculpatory, relevant in any way to the alleged crimes, made by any person, witness, or potential witness in connection with the alleged charges which is in the possession, custody, or control of the State or any other law enforcement officer, or which, by the exercise of due diligence, could or should be known.
Bennett’s prior inconsistent statement fits within this category.
¶ 30. Outside of the presence of the jury, the prosecution called Yurtkuran, an assistant district attorney, who testified that Bennett’s prior inconsistent statement was included in the documents that were given to an administrative assistant to be forwarded to Johnson’s attorney. Although Yurtkuran testified that he had not inspected the documents that Johnson’s attorney received, Yurtkuran also testified that he made the documents — including Bennett’s prior inconsistent statement— available to Johnson’s attorney while he was in the district attorney’s office. According to Yurtkuran, Johnson’s attorney chose not to inspect the file at that time. Yurtkuran further testified that, to his knowledge, Johnson’s attorney never accepted the invitation to review the prosecution’s file. Consequently, the circuit court heard testimony that the prosecution made Bennett’s statement available to Johnson’s attorney. It was certainly within the circuit court’s discretion to believe the sworn testimony of an officer of. the court. •
¶ 31. Even assuming that the prosecution had failed to disclose Bennett’s prior inconsistent statement, the circuit court followed the requirements of Rule *640 9.04(1) of the Uniform Rules of Circuit and County Court. Rule 9.04(1) provides:
If during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:
1. Grant the defense a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photo-graphsf,] or other evidence; and
2. If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.
3. The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.
URCCC 9.04(1). Although the circuit court did not expressly grant Johnson’s request for a continuance, the record indicates that more than an hour had lapsed between the time that Johnson’s attorney allegedly learned about Bennett’s statement for the first time and the time that the prosecution impeached Bennett with his prior inconsistent statement. During that hour, Johnson’s attorney had time to review the substance of Bennett’s prior inconsistent statement. Citing Adams v. State, 772 So.2d 1010, 1013 (¶ 11) (Miss.2000), the State notes that in some instances, where a defendant is entitled to a continuance due to a discovery violation, “postponement of a day or two, or in some cases, even an hour or two, will suffice.” The prosecution further notes that in West v. State, 969 So.2d 147, 150 (¶ 13) (Miss.Ct.App.2007), this Court found that twenty-five minutes was a reasonable amount of time for defense counsel to review undisclosed evidence that was produced on the first day of trial.
¶ 32. Finally, even if we assume that the prosecution failed to disclose Bennett’s prior inconsistent statement, “where a discovery violation results in the admission of evidence that is merely cumulative, the error is harmless.” O’Neal v. State, 977 So.2d 1252, 1255 (¶ 13) (Miss.Ct.App.2008). Warren, through his plea-hearing transcript, and Blocker both testified that Johnson came to Warren’s house looking for guns to “take care of some boys on the north end,” and he left with an armed Bennett. To that end, Bennett’s prior inconsistent statement was cumulative.
¶ 33. We do not find that the prosecution committed a discovery violation. Even if we assume that the prosecution failed to disclose Bennett’s prior inconsistent statement, a violation of Rule 9.04 is harmless error unless it affirmatively appears from the entire record that a violation caused a miscarriage of justice. Wyatt v. City of Pearl, 876 So.2d 281, 284 (¶ 10) (Miss.2004) (citing Payton v. State, 897 So.2d 921, 942 (¶ 67) (Miss.2003)). As stated by the Mississippi Supreme Court:
We must never forget, however, that the trial for life or liberty is not a game and that discovery rules, like other rules of procedure, are not an end in and of themselves but a means to the end that we dare call justice. To that end, we administer our discovery rules with a strong bias in favor of the court and jury receiving and considering all relevant and otherwise admissible evidence.
*641 Houston v. State, 581 So.2d 598, 611 (Miss.1988). Based on the reasons addressed above, we do not find that the circuit court abused its discretion when it allowed the prosecution to impeach Bennett with his prior inconsistent statement. Nor do we find that the circuit court abused its discretion when it denied Bennett’s motion for a mistrial. It follows that we find no merit to this argument.
IV. CROSS-EXAMINATION OF THE PROSECUTION’S EXPERT
¶ 34. This issue stems from the circuit court’s decision to prohibit Johnson from cross-examining Hathcock regarding an SKS rifle that was found under an abandoned house next door to Adams’s house on the day after the shooting. Hathcock tested the SKS and concluded that it could not have been involved in the shootings at Adams’s house because it fired different caliber ammunition. Prior to Johnson’s trial, the prosecution moved to suppress all evidence regarding the SKS rifle. The circuit court reserved ruling on the prosecution’s motion in limine regarding the SKS rifle.
¶ 35. During the prosecution’s direct examination of Hathcock, the prosecutor attempted to ask Hathcock whether the single .223-caliber shell casing found by authorities on the day after the shootings was consistent with the eleven shell casings found at the same scene on the night of the shootings. Hathcock misunderstood the prosecutor’s question. Hathcock responded that the single .223-caliber shell casing had not been fired from the firearm in Crime Lab Submission 2 (the SKS rifle). The prosecutor immediately clarified his question, and Hathcock responded that all of the recovered shell casings were fired from the same weapon.
¶ 36. When Johnson’s attorney began to cross-examine Hathcock, the first thing Johnson’s attorney said was: “I just want some clarification on something you said earlier. You had mentioned something about Evidence Submission No. 2?” The prosecution objected. After an unreported bench conference, the circuit court excused the jury from the courtroom. Johnson’s attorney argued that Hathcock’s misplaced unresponsive answer to the prosecution’s question opened the door to allow cross-examination on the subject of the SKS rifle. Hathcock reiterated that none of the twelve spent cartridge casings found at Adams’s house could have possibly been fired from the SKS rifle.
¶ 37. When the circuit court asked Johnson’s attorney why the SKS rifle was relevant, Johnson’s attorney answered, “I want to ask him about that gun.” Later, Johnson’s attorney explained: “we plan to introduce testimony that’s going to point to the fact that there was another weapon on the scene. And what I’m submitting to the Court is this very well might be the other weapon that was on the scene.” Ultimately, the circuit court held that Hath-cock had not opened the door to cross-examination about the SKS rifle because the SKS rifle was not relevant. Johnson appeals and argues that he should have been allowed to cross-examine Hathcock regarding the SKS.
¶ 38. We have previously stated the appropriate standard of review regarding a circuit court’s decision pertaining to admission or exclusion of evidence. There is no need to repeat it. As explained above, evidence is relevant if it tends to make the existence of any fact more or less probable. The record contains no evidence that the SKS rifle was involved with the events that led to Johnson’s convictions. Instead, it is undisputed that the SKS rifle was not involved with the shootings that occurred at Adams’s house. Hathcock testified that *642 the SKS rifle could not have fired .223-caliber ammunition. It was simply discovered under an abandoned house in the vicinity of Adams’s house. Johnson’s defense theory was not based on self-defense. Instead, he claimed he was not involved with the shootings. Because the presence of a firearm that was not involved with the shootings does not tend to make any fact more or less probable, evidence regarding the SKS rifle was irrelevant. It follows that the circuit court did not abuse its discretion when it prohibited Johnson’s attorney from cross-examining Hathcock regarding the SKS rifle. We find no merit to this issue.
V. SUFFICIENCY AND WEIGHT OF THE EVIDENCE
¶ 39. Johnson argues that he “should not have been found guilty as charged for the principal crimes committed by ... Bennett.” According to Johnson, without being found guilty of conspiring to [procure a rifle and drive Bennett to Adam’s house for a violent altercation], ... Johnson could not be guilty for unlawful acts of ... Bennett.” Johnson does not expressly claim that the circuit court erred when it overruled his motion for a judgment notwithstanding the verdict (JNOV) or, alternatively, for a new trial. Nevertheless, Johnson does request that we reverse his conviction and render judgments of acquittal or remand this matter for a new trial. Consequently, we interpret Johnson’s argument as a challenge of the sufficiency and the weight of the evidence regarding each of his six convictions.
A. SUFFICIENCY
¶ 40. Johnson last challenged the sufficiency of the evidence with his motion for a JNOV. “A motion for a [JNOV] is a challenge to the sufficiency of the evidence.” Gilbert v. State, 934 So.2d 330, 335 (¶ 9) (Miss.Ct.App.2006). As the Mississippi Supreme Court has stated:
in considering whether the evidence is sufficient to sustain a conviction in the face of a motion for [a] directed verdict or for [a JNOV], the critical inquiry is whether the evidence shows beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.... [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Should the facts and inferences considered in a challenge to the sufficiency of the evidence point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty, the proper remedy is for the appellate court to reverse and render.
Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005) (internal citations and quotations omitted). However, this Court will determine that there was sufficient evidence to sustain the jury’s verdict if the evidence was “of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense.” Id. (internal citations and quotations omitted).
¶ 41. Johnson does not relate his argument to any specific conviction. Instead, he argues that there was insufficient evidence of his guilt because the prosecution failed to demonstrate that he and *643 Bennett had conspired to go to Adams’s house and “shoot it up.” Johnson’s argument is misplaced. Johnson was not charged as a conspirator, but as an “aider and abettor” or an “accessory-before-the-fact.” “[I]t is well established that ‘any person who is present at the commission of a criminal offense and aids, counsels, or encourages another in the commission of that offense is an ‘aider and abettor’ and is equally guilty with the principal offender.’ ” Sneed v. State, 31 So.3d 33, 41 (¶ 24) (Miss.Ct.App.2009) (quoting Jones v. State, 710 So.2d 870, 874 (¶ 15) (Miss.1998)).
¶ 42. “Every person who shall be an accessory to any felony, before the fact, shall be deemed and considered a principal, and shall be indicted and punished as such.” Miss.Code Ann. § 97-1-3 (Rev.2006). “One who is an accessory[-]before[-]the[-]fact or one who aids and abets necessarily enters into an agreement that an unlawful act will be done. He participates in the design of the felony.” Scarborough v. State, 956 So.2d 382, 386 (¶ 21) (Miss.Ct.App.2007) (quoting Malone v. State, 486 So.2d 360, 364 (Miss.1986)). To be held criminally liable as an aider and abettor in the commission of a felony, one must incite, encourage, or assist the actual perpetrator in the commission of the crime. Id.
¶ 43. Johnson was convicted — as an aider and abettor — of murder, four counts of aggravated assault, and shooting into an occupied dwelling. As previously mentioned, Johnson does not relate his claim in this issue to any one of his six convictions. Deliberate-design murder is “[t]he killing of a human being without the authority of law by any means or in any manner ... [w]hen done with deliberate design to effect the death of the person killedf.]” Miss.Code Ann. § 97-3-19(l)(a) (Rev. 2006). Aggravated assault is an “attempt[ ] to cause or purposely or knowingly cause[ ] bodily injury to another with a deadly weapon.” Miss.Code Ann. § 97-3-7(2)(b) (Rev.2006). Shooting into an occupied dwelling occurs when one “willfully and unlawfully shoot[s] or discharge[s] any pistol, shotgun, rifle[,] or firearm of any nature or description into any dwelling house or any other building occupied by persons, whether actually occupied or not[.]” Miss.Code Ann. § 97-37-29 (Rev. 2006). Viewing the evidence in the light most favorable to the prosecution, we find that there was sufficient evidence to convict Johnson on all counts as an aider and abettor.
¶ 44. Evidence provided by Samuel, England, and Parker indicated that Taylor and Lampkin were involved in an altercation at Adams’s house. The record reflects that Taylor was angry when he left Adams’s house, and he informed everyone there that they had better not be there when he came back. The jury heard testimony that Johnson picked up Taylor and drove him to Warren’s house. At Warren’s house, Johnson told Warren that he needed some guns because of “some boys on north end.” Through Blocker’s testimony and the transcript of Warren’s guilty-plea hearing, the jury heard evidence that after Johnson asked for “some guns,” Bennett retrieved a rifle. Johnson then drove Bennett to Adams’s house. Blocker testified that Johnson had to have known that Bennett had a rifle when Bennett got into Johnson’s car. Johnson then drove himself, Bennett, and Taylor back to Adams’s house. When Johnson arrived at Adams’s house, Bennett got out of Johnson’s car. Parker testified that he had “no doubt” that Bennett was armed with a rifle at that time. Parker, Samuel, and England all testified that after returning to Adams’s house, Johnson called Lampkin over to his car. After Taylor and Lamp-kin resumed their argument, Johnson told *644 Lampkin to get away from his car. Within moments, Bennett exclaimed he was “sick of’ the people at Adams’s house and opened fire on an entire group of people. Bennett killed Brown, wounded four other people, and shot Adams’s house.
¶ 45. Johnson attacks the credibility of the prosecution’s witnesses by noting that some of them had been drinking and/or smoking marijuana at the time they observed the events. Be that as it may, the jury is the sole judge of the credibility of witnesses^ and the jury’s decision based on conflicting evidence will not be set aside where there is substantial and believable evidence supporting the verdict. Hollins v. State, 799 So.2d 118, 122 (¶ 10) (Miss.Ct.App.2001). Considering the volume of evidence against him, the jury could have reasonably concluded Johnson assisted Bennett by informing him of the previous altercation, requesting a weapon, driving Bennett to Adams’s house after Bennett procured a weapon, and allowing Bennett to exit his car while armed with a rifle. Consequently, we find there was sufficient evidence to convict Johnson of all six crimes as an aider and abettor or an accessory-before-the-fact. We, therefore, find no merit to this issue.
B. WEIGHT OF THE EVIDENCE
¶ 46. We are mindful that as we review the circuit court’s decision to deny a motion for a new trial, this Court “will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush, 895 So.2d at 844 (¶ 18). The supreme court has further instructed that when reviewing a trial court’s decision to deny a motion for a new trial:
The motion ... is addressed to the discretion of the court, which should be exercised with caution, and the power .to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict. However, the evidence should be weighed in the light most favorable to the verdict. A reversal on the grounds that the verdict was against the overwhelming weight of the evidence, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Rather, ... the court simply disagrees with the jury’s resolution of the conflicting testimony. This difference of opinion does not signify acquittal any more than a disagreement among the jurors themselves. Instead, the proper remedy is to grant a new trial.
Id. (footnote and internal citations and quotations omitted).
¶ 47. Viewing the evidence discussed above in the light most favorable to the verdict, we do not conclude that it would sanction an unconscionable injustice to allow Johnson’s convictions to stand. Consequently, we find no merit to Johnson’s claim that- his convictions are contrary to the overwhelming weight of the evidence.
VI. CUMULATIVE EFFECT
¶ 48. Johnson claims that this Court should declare the cumulative effect of the errors committed at trial require us to reverse the judgments of conviction and remand this matter for a new trial. We have found no errors. It follows that there can be no cumulative effect of errors that do not exist. We find no merit to this argument.
¶ 49. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, MURDER, AND SENTENCE OF LIFE; COUNTS II-V, AGGRAVATED ASSAULT, AND SENTENCE OF TEN YEARS FOR EACH COUNT; AND COUNT VI, *645 SHOOTING INTO AN OCCUPIED DWELLING, AND SENTENCE OF FIVE YEARS, WITH THE SENTENCES TO RUN CONSECUTIVELY, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, MAXWELL AND RUSSELL, JJ„ CONCUR. MYERS, J., NOT PARTICIPATING.

. Warren and Bennett were convicted before Johnson went to trial. Warren had pled guilty as an accessory-after-the-fact. Bennett had been convicted of murder, four counts of aggravated assault, and shooting into an occupied dwelling.