# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00071-COA

**CHARMINDER WALLACE** APPELLANT

**v.**

**STATE OF MISSISSIPPI** APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 12/16/2022 |
| TRIAL JUDGE: | HON. PAUL S. FUNDERBURK |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: MOLLIE MARIE McMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALEXANDRA LEBRON |
| DISTRICT ATTORNEY: | JOHN DAVID WEDDLE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/27/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**CARLTON, P.J., FOR THE COURT:**

¶1. Charminder Wallace appeals his conviction and sentence for armed robbery. On appeal, Wallace claims that (1) the Lee County Circuit Court erred by commencing the trial in Wallace's absence, (2) the State committed prosecutorial misconduct during closing arguments, and (3) the verdict was against the overwhelming weight of the evidence. Finding no error, we affirm.

## FACTS

¶2. On December 18, 2019, Wallace was arrested in connection with an armed robbery of a convenience store called the Express Shop in Tupelo, Mississippi. A Lee County grand

jury indicted Wallace on one count of armed robbery, which we discuss below, pursuant to Mississippi Code Annotated section 97-3-79 (Rev. 2014).

¶3.     After a trial, a jury returned a verdict finding Wallace guilty of armed robbery.  The trial court sentenced Wallace to serve a term of fifty years in the custody of the Mississippi Department of Corrections, with ten years suspended, followed by five years of post-release supervision.

¶4.     Wallace filed a post-trial motion for judgment notwithstanding the verdict or, in the alternative, a new trial, which the trial court denied.  This appeal followed.

## DISCUSSION

### I.     Conducting Voir Dire in Wallace's Absence

¶5.     Wallace first argues that the trial court erred by conducting voir dire in his absence, which Wallace claims denied him of his state and federal constitutional right to be present at every stage of his trial.  Wallace maintains that the record shows his absence was not willful, voluntary, or deliberate and, therefore, that the trial court abused its discretion by conducting voir dire without Wallace present.  Wallace asserts that because he was not present for voir dire, he was unable to assist his attorney in selecting the petit jury.

¶6.     We recognize that "[b]oth our federal and state constitutions guarantee an accused's right to be present at every stage of his or her trial[,]" including voir dire. *Hampton v. State*, 309 So. 3d 1055, 1060 (¶25) (Miss. 2021) (citing U.S. Const. amend. VI; Miss. Const. art. 3, § 26); *Simmons v. State*, 746 So. 2d 302, 308 (¶23) (Miss. 1999).  However, a defendant may waive this right by "[his] absence from any proceeding, if the court finds that such

2

absence was voluntary and constitutes a knowing and intelligent waiver of the right to be present." *Nevels v. State*, 325 So. 3d 627, 634 (¶23) (Miss. 2021) (quoting MRCrP 10.1(b)(1)(B)). Trial in absentia is also "expressly permit[ted] . . . when 'the defendant is on recognizance or bail and is in any way in default for nonappearance.'" *Moore v. State*, 287 So. 3d 189, 199 (¶32) (Miss. 2020) (quoting Miss. Code Ann. § 99-17-9 (Rev. 2015)); *see also Blanchard v. State*, 55 So. 3d 1074, 1077-78 (¶17) (Miss. 2011).

¶7.     The record reflects that Wallace's trial was set for Monday, October 31, 2022, at 9:00 a.m. On the morning of trial, Wallace was not present in the courtroom. Regardless, the trial court commenced with impaneling the jury and holding voir dire proceedings.[1] After the court recessed for lunch, the trial judge questioned Wallace's counsel about Wallace's absence. Wallace's counsel explained that Wallace then resided in Jackson, Mississippi, and that Wallace had agreed to drive from Jackson to Tupelo on Sunday evening to make sure that he was present for trial on Monday morning. Counsel stated that on Sunday night, Wallace texted him and indicated that his grandmother would not be able to drive him to Tupelo. Counsel stressed to Wallace that he needed to be present for his trial. Counsel stated that he told Wallace that "he needs to jump on a bus, he needs to drive himself, he needs to start walking, but he needs to be here." On the morning of trial, Wallace texted his counsel and alerted him that Wallace's transportation "had fallen through and that he had no ride." Counsel advised Wallace that the trial would proceed in his absence, and counsel even

---

[1] In the transcript, the trial judge indicated that before starting the trial, he and Wallace's counsel spoke off-the-record regarding Wallace's absence. The trial court later questioned Wallace's counsel about Wallace's absence on the record.

3

offered to wire money to Wallace so that he could take a bus from Jackson to Tupelo. At 10:00 a.m., Wallace texted his counsel and stated that he had secured transportation to Tupelo and was en route. Counsel assured the trial judge that Wallace was aware of the time and date of the proceedings.[2]

¶8. After discussions with Wallace's counsel, the trial judge determined that "there is absolutely no question [Wallace] was advised of his trial date and time." Because Wallace was out on bond, the State then moved to revoke Wallace's bond and requested that Wallace be held in custody during the pendency of his trial. The trial court granted the motion. The trial judge then asked the bailiff to call Wallace's name three times to determine if Wallace was present. After determining that Wallace had failed to appear, the trial court entered a judgment nisi and remanded Wallace into custody.[3]

¶9. The trial court then resumed the voir dire proceedings. After the parties had made their challenges for cause, but before they began peremptory strikes, Wallace appeared in the courtroom. The trial judge addressed Wallace's late arrival and questioned Wallace about whether he had been aware of his trial date. Wallace confirmed that his counsel had informed him of his trial date and time. Wallace's counsel informed the trial judge that he and Wallace had communicated about the trial date via text message and a phone

---

[2] The record reflects that on October 25, 2022, the trial court entered an order resetting the trial from Tuesday, November 1, 2022, to Monday, October 31, 2022. The transcript reflects that the trial court intended to impanel a jury on Monday morning, and the trial would begin on Tuesday. Wallace's counsel confirmed that he alerted Wallace to the new, earlier trial date on October 25, 2022, and that Wallace was aware that the proceedings were scheduled to commence on Monday, October 31, 2022, at 9:00 a.m.

[3] The trial court eventually set aside the judgment nisi after Wallace appeared.

4

conversation and that Wallace had even come to Tupelo the week before trial in order to meet with his counsel and prepare for trial. Wallace's counsel reiterated that Wallace had experienced transportation issues that prevented him from appearing in the courtroom on time, and Wallace also confirmed that he had experienced transportation issues.

¶10. The trial judge inquired as to whether Wallace had arrived in time to assist with the jury selection by reviewing the juror information sheets and discussing potential jurors. Counsel responded that Wallace had arrived in the courtroom when the State tendered its first twelve unchallenged jurors, but he stated that Wallace's "input was very minimal or nominal at best."

¶11. After hearing from Wallace and his counsel, the trial judge found that Wallace failed to appear for voir dire despite being notified of his trial date and time. The trial judge therefore determined that Wallace's failure to appear was "wilful, voluntary[,] . . . deliberate," and "without legitimate reason."

¶12. Our review of the transcript shows that Wallace's counsel did not object to the trial court's decision to proceed with voir dire in Wallace's absence or request a continuance; as a result, Wallace failed to preserve this issue for appellate review. *Blanchard*, 55 So. 3d at 1077 (¶16). In this case, we will review for plain error. *Id*. Under a plain error standard, we will reverse only "if the error involved a fundamental and/or substantive right and resulted in a manifest miscarriage of justice or seriously affected the fairness, integrity or public reputation of judicial proceedings." *Id*. (citation and internal quotation marks omitted).

¶13. As stated, Wallace was released on bond pending trial and was in default for

5

nonappearance. This Court has held that where a defendant "was released on bond pending trial and was in default for nonappearance, it was not plain error to conduct his trial in absentia." *Barksdale v. State*, 176 So. 3d 108, 111 (¶16) (Miss. Ct. App. 2015). Additionally, the supreme court has held that "in the limited circumstance where the defendant, who is out on bond and represented by counsel, fails to appear at the commencement of his trial, but appears before any evidence is taken, we will not reverse for a new trial, unless the defendant shows prejudice resulting from his absence at the commencement of the trial." *Simmons*, 746 So. 2d at 307 (¶21). In his appellate brief, Wallace acknowledges that he arrived to the courtroom in time for jury selection, but Wallace claims that he "was unable to assist his attorney in selecting the jury because he had not been present for voir dire." However, Wallace fails to allege that he suffered any prejudice due to his inability to assist his attorney in selecting a jury.

¶14. Furthermore, "when the trial court has given instruction on when to appear for trial, and the defendant subsequently fails to appear, the trial court has not abused its discretion by commencing with the trial in absentia." *Blount v. State*, 361 So. 3d 687, 690-91 (¶10) (Miss. Ct. App. 2022) (citing *Hampton*, 309 So. 3d at 1061 (¶27)). We have held that "[t]his rationale applies even if no direct evidence was before the trial court that his absence was voluntary." *Id.* at 691 (¶10) (citation and internal quotation marks omitted). Here, the record confirms that Wallace was aware of his trial date and time, and neither party disputes this fact.

¶15. Based on our findings above, we hold that the trial court did not err by conducting voir

dire in Wallace's absence.

## II. Prosecutorial Misconduct

¶16. Wallace next argues that the State repeatedly made improper remarks during closing arguments. Specifically, Wallace asserts the State made comments that shifted the burden of proof from the State to Wallace, and he alleges the State commented on Wallace's failure to present evidence. Wallace claims that the State's prosecutorial misconduct deprived him of a fair trial.

¶17. Wallace acknowledges that because he failed to object during the State's closing arguments, his arguments are procedurally barred on appeal. *Evans v. State*, 226 So. 3d 1, 31 (¶78) (Miss. 2017). However, Wallace asks this Court to review the issue for plain error. "[T]he plain error doctrine will be applied to closing arguments when the substance of the statement is out of bounds for closing arguments." *Spiers v. State*, 361 So. 3d 643, 662 (¶70) (Miss. 2023) (internal quotation marks omitted); *see also Ambrose v. State*, 254 So. 3d 77, 129 (¶161) (Miss. 2018). A prosecutor's statement is out of bounds when it is "so inflammatory that the trial judge should have objected on his own motion." *Spiers*, 361 So. 3d at 662 (¶70) (internal quotation marks omitted). Additionally, we must consider "[a]ny allegedly improper prosecutorial comment . . . in context, considering the circumstances of the case, when deciding on their propriety." *Ronk v. State*, 172 So. 3d 1112, 1137 (¶60) (Miss. 2015).

¶18. In reviewing Wallace's claims of prosecutorial misconduct, we recognize that "[a]ttorneys are to be given wide latitude in making their closing arguments." *Spiers*, 361

7

So. 3d at 662 (¶71). The supreme court has clarified that "wide latitude of discussion is allowed" as long as the prosecutor "keeps fairly within the evidence and issues involved." *Id*. Prosecutors are prohibited from using "tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury." *Id*. The trial court should intervene when a prosecutor "departs entirely from the evidence in his arguments or makes statements intended solely to excite the passions or prejudices of the jury, or makes inflammatory and damaging statements of fact not found in the evidence[.]" *Id*. at 662-63 (¶71). Reversible error occurs when "the natural and probable effect of the improper argument of the prosecuting attorney is to create such an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created." *Murry v. State*, 359 So. 3d 1104, 1113 (¶27) (Miss. Ct. App. 2022).

¶19. Wallace first claims that the State improperly commented on Wallace's failure to present evidence. During closing arguments, the prosecutor said:

> Now, most of those facts are not in dispute. The defendant offered no evidence to dispute that on December the 18th, 2019, right here in Lee County, Mississippi, Ms. Melinda Green was working at that Express Shop when a masked man approached her at that front door, pointed a pistol in her face, and robbed her.

¶20. Upon review, we do not find that the State's comments were improper or that the State was commenting on Wallace's failure to offer evidence disputing that he committed the robbery. The transcript reflects that throughout the trial, Wallace never disputed that the robbery occurred. Wallace's counsel even conceded in opening statements, "[W]e don't dispute that the store was robbed. We don't . . . take issue with that at all. What we do take

issue with is the State maintaining that Mr. Wallace is the robber." After considering the State's comments in context, we find that the State was simply commenting on the fact that Wallace did not dispute that the robbery occurred.

¶21. During Wallace's closing arguments, his defense counsel commented on the State's lack of evidence against Wallace. Wallace asserts that during the State's rebuttal, the prosecutor made statements that shifted the burden of proof from the State to Wallace:

> So before I go any further and talk to you about the evidence, I want to talk about the defense in this case. Now, you have heard the defendant's lawyer tell you that the defendant does not have to prove anything, and that is true. That is the law. The defendant does not have to present any evidence in this trial, and that is true. But there is nothing to prevent him from doing so and nobody anywhere can prevent him from doing so if he wants to.
> Now, he wants to talk about, well, we didn't have a video, didn't have all the pictures. We don't have the gun. We don't have the money. Well, the defense attorney has the same subpoena power as I do. The defense attorney can subpoena video, photographs, phone records, Facebook information, documents. You can have all that. And if he wants to, he can bring that right in here to show you. But we don't have that, and that is fine because we supplied the evidence in this case.

¶22. After "reading the prosecutor's comments in the context and circumstances of the case," we find no merit to Wallace's claim that the State's comments shifted the burden of proof to Wallace. *Smith v. State*, 258 So. 3d 292, 306 (¶40) (Miss. Ct. App. 2018) (internal quotation marks omitted). Rather, we find that "the prosecutor was merely commenting on the inadequacy and weakness of [Wallace's] defense." *Id*. This Court has held that while "the burden of proof in a criminal case never shifts from the State to the defendant[,] . . . it is not error to comment on the defense's failure to offer any evidence whatsoever to counter or explain the State's evidence." *Johnson v. State*, 89 So. 3d 630, 637-38 (¶23) (Miss. Ct.

9

App. 2011). "Furthermore, it is not improper for the prosecution to argue in closing that a defendant's case is inadequate." *Id*. at 638 (¶23); *see also Dora v. State*, 986 So. 2d 917, 923 (¶¶12-13) (Miss. 2008) (recognizing that the prosecution is permitted to comment on the absence of evidence to support defendant's defense and to point out that the defense's theory of defense is unsupported by the evidence); *Smith*, 258 So. 3d at 305-06 (¶¶39-40) (finding that the State's comments in closing arguments that "the defense hasn't put on one shred of evidence contradicting the elements of . . . the crime . . . of armed robbery" did not shift the burden of proof to the defense).

¶23. Additionally, the record reflects that the trial court "adequately instructed the jury regarding the prosecution's burden of proof." *Johnson*, 89 So. 3d at 638 (¶24). Specifically, the trial court instructed the jury that Wallace was presumed to be innocent, that the prosecution had the burden of proving every element beyond a reasonable doubt, and that Wallace was not required to prove his innocence. Our jurisprudence has long held that "jurors are presumed to follow the court's instructions." *Smith*, 258 So. 3d at 306 (¶41) (citing *Johnson v. State*, 475 So. 2d 1136, 1142 (Miss. 1985)).

¶24. Keeping in mind our standard of review, we do not find that the prosecutor's statements during closing arguments were "so inflammatory that the trial judge should have objected on his own motion." *Spiers*, 361 So. 3d at 662 (¶70). We therefore find no reversible error.

### III.    Weight of the Evidence

¶25. Finally, Wallace argues the overwhelming weight of the evidence fails to support the

10

jury's guilty verdict, and therefore the trial court erred in denying his motion for new trial.

¶26.   "A motion for a new trial challenges the weight of the evidence." *Taylor v. State*, 110 So. 3d 776, 784 (¶28) (Miss. 2013).  We review a trial court's denial of a motion for a new trial for an abuse of discretion.  *Wilson v. State*, 904 So. 2d 987, 994 (¶21) (Miss. 2004). When reviewing a challenge to the weight of the evidence, "this Court never reweighs the evidence, assesses witness credibility, or resolves conflicts between the evidence." *Keys v. State*, 373 So. 3d 565, 573 (¶27) (Miss. Ct. App. 2023) (quoting *Little v. State*, 233 So. 3d 288, 292 (¶20) (Miss. 2017)).  Rather, "we weigh the evidence in the light most favorable to the verdict." *Davis v. State*, 379 So. 3d 312, 322 (¶32) (Miss. 2024) (internal quotation mark omitted).  We will disturb a jury's verdict only "when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id*.  Keeping this standard in mind, we turn to review the evidence and testimony presented at trial.

¶27.   Melinda Green testified that on the morning of December 18, 2019, she was working the opening shift at the Express Shop convenience store in Tupelo.  While she was alone in the store, a man burst through the front door and pointed a gun at her face.  Green described the suspect as a skinny black male, and Green estimated his height to be a little over five feet tall.  Green testified that the suspect was wearing a black jacket with black pants, black gloves, and a black ski mask.[4]  The man pushed Green back to the counter and yelled for her to give him the money from the store.  Green testified that the store owner kept money in

---

[4] Green explained that even though the suspect was wearing a ski mask, she knew he was a black male because she could see his skin color whenever he closed his eyes.

three locations: the cash register, a "lottery drawer" to pay lottery winnings, and a change box. While a terrified Green struggled to open the register, the man took money from the lottery drawer and change box. He then grabbed the money out of the register once Green finally opened it. After the man left, Green "curled up in the floor crying" until a customer came in and called 911.

¶28. Officer Wes Kloac of the Tupelo Police Department was the first officer to respond to the call. Officer Kloac testified that he was dispatched to the scene at approximately 6:30 a.m., and he arrived at the Express Shop less than five minutes after receiving the call. Officer Kloac testified that after he received a description of the suspect from Green, he began searching the area. Near the store, Officer Kloac observed children waiting for the school bus. He described the suspect to the children, and they informed Officer Kloac they had seen "a male, or a person, matching that description running south across [the street] through yards." As Officer Kloac started down the street to search for the suspect, he saw that Officer Mike Ray of the Tupelo Police Department had arrived on the scene with Enzo, a tracking and narcotics detection dog. Officer Kloac testified that his lieutenant asked him to keep up with Officer Ray and Enzo while Enzo "tracked."

¶29. Officer Ray testified and explained Enzo's tracking process during an armed robbery investigation. According to Officer Ray, "body odor" is a "small part" of Enzo's tracking; Enzo also tracks based off of anything disturbed along the ground, including broken branches or trampled grass. Officer Kloac and Officer Ray both testified that Enzo began tracking south from the Express Store. Officer Ray had Enzo break this track when someone radioed

12

the officers regarding a report that the suspect may have entered an abandoned church in the area. According to procedure, the officers went to the church and cleared the building; no one was there.

¶30. After clearing the church, Enzo returned to his previous route and began tracking south of where the children reported seeing the suspect run. Officer Kloac and Officer Ray both testified that Enzo led the officers to a belt in the front yard of a house. The belt was eventually recovered and admitted into evidence at trial. From there, Enzo tracked to the front door of a nearby residence.

¶31. Officer Ray testified that the police would not enter a house based solely on a dog's tracking, and he explained that he included Enzo's tracking in the totality of the circumstances around the house. The officers knocked on the door and ordered anyone inside the house to come out with their hands up. After no one responded, the officers continued to knock, again ordering the occupants of the house to come outside.

¶32. The record reflects that the house at issue was rented to Tito Shannon. While the officers were knocking on the front door, Shannon arrived home, and he gave the officers permission to enter the house. Shannon tried but failed to open the front door for the officers, explaining that the chain on the other side of the door had been locked. According to Shannon, this lock could only be accessed from inside of the house. Shannon told the officers that no one else should be inside the house. At trial, Shannon testified that another man, James Smith, occasionally stayed at the house with him. However, Smith left for work each morning at 4:00 a.m., so Shannon knew that Smith was not inside of the house when

the officers arrived. Shannon then offered to kick down the front door.

¶33. Shortly after Shannon's offer to kick down the door, the officers heard someone inside of the house screaming, "Who are y'all looking for?" The officers again loudly commanded whoever was inside the house to exit. Officer Kloac testified that the door eventually opened. Officer Kloac identified Wallace as the man who opened the door. After Wallace failed to comply with the officers' orders to exit the house, Officer Kloac reached inside, grabbed Wallace, and pulled him out of the house. The officers arrested Wallace for disorderly conduct and failure to comply with an order of a police officer.

¶34. Officer Patrick Johnson of the Tupelo Police Department was the lead investigator in the case. He testified that when he received the call about the armed robbery, he went to the Express Shop and took Green's statement regarding the robbery. Officer Johnson testified that Green, who was five feet tall, described the suspect as "slightly taller than her[.]" Officer Johnson also obtained images from the store's security camera. Officer Johnson testified that the images showed that the suspect was wearing a black zip-up hooded jacket that had a unique zipper, as well as "distinctive" shoes with a split pattern in the color. Photographs from the surveillance footage were admitted into evidence, and the suspect's zip-up jacket and shoes are visible in the photographs.

¶35. Officer Johnson then went to Shannon's residence, where Wallace was being detained by officers. Officer Johnson asked Wallace to "stand tall" beside the patrol vehicle so that he could observe Wallace's height and compare it to Green's description of the suspect. Officer Johnson testified that Wallace appeared to fit Green's description of the suspect. At

14

trial, Green testified that Wallace had the same "build and everything" as the man who robbed the store.

¶36. Officer Johnson interviewed Wallace and took a statement from him. Wallace informed Officer Johnson that he was staying at Shannon's house with permission. Shannon testified at trial and confirmed that he had allowed Wallace to stay at his house temporarily. Wallace told Officer Johnson that Smith had also spent the night at Shannon's house and that Smith left for work that morning around 4:00 a.m. Wallace maintained that he had been inside the house all morning and had not left the premises.

¶37. When officers searched the house, they recovered a black zip-up hooded jacket and shoes that matched the "distinct" items seen on the security footage from the Express Shop. These items were admitted into evidence at trial. Officer Ray took Enzo back over the area he had already tracked in an attempt to locate the gun used in the robbery or the stolen money. Enzo eventually recovered a black glove, which was admitted into evidence. However, the officers did not recover the stolen money or the gun used in the robbery.

¶38. Officer Kloac also testified that prior to arresting Wallace, the officers observed a Mustang parked at Shannon's house. According to Officer Kloac, two black males in their mid-twenties were sitting inside the Mustang, smoking marijuana. Officer Kloac testified that the two males were inside the Mustang when Enzo tracked to Shannon's house, but he clarified that Enzo tracked directly to the front door of the house, not to the Mustang. After the officers identified the men, they allowed them to leave. Officer Kloac testified, however, that later the same day, he initiated a traffic stop on the Mustang for a window tint violation.

The car was towed and searched. Officer Kloac confirmed that the search did not uncover any evidence relating to the armed robbery. Officer Johnson also testified and said that the two men in the Mustang were eliminated as suspects in the robbery.

¶39.    On appeal, Wallace asserts that the overwhelming weight of this evidence fails to support the jury's verdict. Specifically, he claims that the State's evidence "consists of a dog tracking based on ground disturbances, not based on the scent of an individual." Wallace also states that Enzo ultimately led the police to the front door of a house that could be accessed by multiple people, not just Wallace. Regarding the photographs taken from the store's surveillance videos, Wallace maintains that the photographs are of such poor quality that nothing of evidentiary value can be determined from them other than confirming that the suspect wore all black clothing and had his face covered. Wallace also argues that the police were unable to locate the gun or the stolen money even after making multiple passes over the route the dog followed.

¶40.    After "[c]onsidering the evidence in the light most favorable to the verdict," we do not find "that the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Douglas v. State*, 378 So. 3d 361, 376 (¶61) (Miss. 2024) (internal quotation marks omitted). The transcript reflects that despite Wallace's claim that Enzo tracks based only on ground disturbances, Officer Ray testified at trial that Enzo also relies on "body odor." Officer Kloac testified that despite the presence of other people near Shannon's house, Enzo tracked past the people and went straight to the front door of Shannon's house, where Wallace was inside. Officer Johnson

16

and Green both testified that Wallace met the description of the suspect's build and height. Officer Johnson further testified that although the officers encountered other people around Shannon's house during the investigation, they were eliminated as suspects in the armed robbery. The police officers testified that when they searched Shannon's house, they recovered a zip-up jacket and shoes matching the items from the surveillance footage. Although the photographs from the surveillance footage are not the clearest quality, the suspect's zip-up jacket and shoes are still visible in the photographs. The supreme court has held that "the sufficiency or insufficiency of a police investigation goes to the weight of the evidence, and it is for a jury to decide what evidence to believe." *Cox v. State*, 849 So. 2d 1257, 1267 (¶30) (Miss. 2003). As stated, this Court "does not reweigh evidence or determine a witness's credibility." *Williams v. State*, 285 So. 3d 156, 160 (¶17) (Miss. 2019). "When evidence or testimony conflicts, the jury is the sole judge of the weight and worth of evidence and witness credibility." *Id*.

¶41. After our review, we find that the trial court did not abuse its discretion by denying Wallace's motion for a new trial.

## CONCLUSION

¶42. Because we find no reversible error, we affirm Wallace's conviction and sentence.

¶43. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.**

17

**WESTBROOKS, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶44. I agree with the majority's findings on the issue of prosecutorial misconduct and the weight of the evidence; however, I do not agree with the analysis regarding the issue of trial in absentia. The majority finds that the trial court did not err by conducting voir dire in Wallace's absence. I acknowledge that "a defendant may waive the right to be present at any proceeding . . . by the defendant's absence . . . if the court finds that such absence was voluntary and constitutes a knowing and intelligent waiver of the right to be present." MRCrP 10.1(b)(1)(B). I believe that in this instance Wallace's absence was not a voluntary waiver.

¶45. Around the time of trial, Wallace did not have a vehicle of his own that he could use to get back and forth from Jackson (where he was currently residing) to Tupelo (where the trial was being held). The day before the trial began, Wallace informed his counsel that his grandmother, who had originally agreed to take him to Tupelo for the trial, was no longer going to be able to do so. Wallace told his counsel he would attempt to find another way to get to Tupelo before the trial began. On the morning of trial, Wallace contacted his counsel again to let him know his alternate transportation had fallen through, and he did not have a way to get to Tupelo. Wallace's counsel stressed to him that he needed to be present for trial, but if he was not there, the trial would proceed in his absence.

¶46. Even though less than one week before the trial began the judge decided to begin the trial one day earlier than originally scheduled, it is not contested that Wallace knew the time and date of his trial. However, a finding that Wallace willfully, voluntarily, and deliberately

18

did not show up for his trial is one I am not willing to make.

¶47.    In a similar case brought before this Court, we found that the defendant did not willfully, voluntarily, and deliberately make himself absent from trial. *Haynes v. State*, 208 So. 3d 4, 6 (¶16) (Miss. Ct. App. 2016).  In *Haynes*, the defendant informed his counsel the morning before trial that his car had broken down, and once trial began his counsel informed the court of these transportation issues.  The defendant's counsel told the trial judge that proceeding without the defendant would greatly prejudice his client, and counsel moved for a continuance, which the judge denied.  This Court ultimately found no evidence showed the defendant was willfully absent from trial due to his car troubles.

¶48.    Since this Court's decision in *Haynes*, the Mississippi Supreme Court has held that *Haynes* has "limited persuasive value" because it was decided before the adoption of the Mississippi Rules of Criminal Procedure.  *Nevels v. State*, 325 So. 3d 627, 635 (¶28) (Miss. 2021) (citing *Hampton v. State*, 309 So. 3d 1055, 1061 (¶28) (Miss. 2021)).  While I acknowledge that *Haynes* has less value, that does not mean it has absolutely no value, and I believe Wallace's case appropriately fits its narrow application.

¶49.    In another case before this Court, a defendant was found to willfully be absent from trial due to an outstanding warrant for the defendant's arrest.  *Robinson v. State*, 66 So. 3d 198, 199 (¶4) (Miss. Ct. App. 2011).  In another case regarding trial in absentia, this Court found the defendant was willfully absent because he made no effort to contact his counsel and inform the lawyer of his car troubles.  *Arnold v. State*, 93 So. 3d 908, 912 (¶9) (Miss. Ct. App. 2012).  In that case, the Court further noted that the defendant lived approximately nine

19

miles from the courthouse and made no attempt to walk or find an alternative way of transportation. *Id*.

¶50. In the case at hand, even though Wallace's counsel did not request a continuance, it is still clear Wallace was not willfully, voluntarily, or deliberately absent. He did not have any outstanding warrants for his arrest that would give him any incentive to evade going to trial. Unlike the defendant in *Arnold* who was only nine miles from the courthouse, Wallace was approximately 200 miles from the location his trial was being held. Further, Wallace had met with his counsel in Tupelo the week before trial to prepare and informed him he would be coming back to Tupelo on Sunday night before trial began on Monday morning. Because Wallace did not have his own vehicle at the time, he was relying on his grandmother to take him to Tupelo on Sunday. It was on Sunday that Wallace informed his counsel his ride had fallen through, and he would make an attempt to find another way of transportation. However, his alternate transportation was also unable to take him. It is clear Wallace was reliant on others for his transportation to trial, and their inability to do so was not at any fault of his own.

¶51. Further, while the record does show that Wallace's counsel offered to wire him money to get a bus ticket from Jackson to Tupelo, there is nothing in the record offered by the State to suggest that the bus would have gotten Wallace to Tupelo before the trial began. Wallace even explained to the court upon his arrival that the Greyhound service his counsel had offered to pay for was no longer located in Jackson. The closest Greyhound service was an hour away, to which he did not have a ride either.

20

¶52. Even though Wallace did not arrive until after voir dire had begun, he still made an effort to arrive at trial as soon as possible, which is indicative that his absence from the beginning of trial was not willful, voluntary, or deliberate. For this reason, I believe the trial court erred by conducting voir dire in Wallace's absence.

**McDONALD, J., JOINS THIS OPINION.**