# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-KA-01375-COA

TAMEKA SMITH A/K/A TAMEKA MARQUIETA SMITH A/K/A TAMEKA M. SMITH                                                                APPELLANT

v.

STATE OF MISSISSIPPI                                                                APPELLEE

DATE OF JUDGMENT:               08/14/2015
TRIAL JUDGE:                    HON. ROBERT B. HELFRICH
COURT FROM WHICH APPEALED:      FORREST COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:         OFFICE OF STATE PUBLIC DEFENDER
                                BY: HUNTER NOLAN AIKENS
ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
                                BY:  KAYLYN HAVRILLA MCCLINTON
DISTRICT ATTORNEY:              PATRICIA A. THOMAS BURCHELL
NATURE OF THE CASE:             CRIMINAL - FELONY
DISPOSITION:                    AFFIRMED - 07/24/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE IRVING, P.J., CARLTON AND GREENLEE, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1.     On October 16, 2013, Tameka Smith was indicted by a Forrest County grand jury on one count of armed robbery of a Dollar General store on June 5, 2013.  The case proceeded to trial on March 18, 2015, and the jury found Smith guilty of armed robbery.  Smith was sentenced to serve twenty years in the custody of the Mississippi Department of Corrections (MDOC), with twelve years to serve, eight years suspended, and five years of post-release supervision.

¶2.     On appeal, Smith asserts that (i) the trial court erred in overruling Smith's *Batson*

objection; (ii) prosecutorial misconduct during closing arguments violated Smith's right to a fair trial; (iii) testimony from the State's witness, Detective Casey Sims, violated Smith's Sixth Amendment Confrontation Clause right to confront adverse witnesses; (iv) the trial court erred in refusing Smith's requested jury instruction on the defense's theory of misidentification; and (v) the trial court erred in allowing the State to introduce CD exhibits in envelopes containing written notations. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶3. This case concerns an armed robbery of a Dollar General store near Hattiesburg, Mississippi, on June 5, 2013, at around 8 p.m. Store manager Paige Arnold and cashier Kelly James were working at the Dollar General that night. Arnold was the State's first witness. She testified that she was on the toothpaste aisle when a woman in a gray hoodie with a white towel over her face approached her and said she had a toothache. Arnold testified that she was 5' 9½" tall, and she guessed that the woman was around 5' 6" tall. Arnold showed the woman where the oral pain medications were, then resumed straightening up the toothpaste aisle. Later, the cashier, Kelly James, accompanied the same woman to the toothpaste aisle, and showed her the same medicine Arnold had shown her. Kelly returned to her register at the front of the store.

¶4. About ten minutes later, a customer approached Arnold and said she was needed up front. Arnold testified that she walked to the front of the store, and the female customer from the toothpaste aisle told her she did not have the money to buy the medicine and needed Arnold to cancel the transaction, which Arnold did. The customer was standing off to the

2

side when Arnold opened the cash register. Arnold testified that the female customer ran between her and James (the cashier) and started grabbing money out of the cash register. Arnold testified that she jumped on the woman's back and started taking the money back from her, and James also started grabbing the money back from the woman.

¶5.    According to Arnold, the woman dragged Arnold and James outside, and Arnold pulled off the woman's jacket and towel and looked at the woman. The woman got in a car, and Arnold got a description of the vehicle and the vehicle's tag number. Arnold recalled she watched the woman for about a minute while she was in her car because there was another car entering the parking lot, so the woman had to wait to leave. Arnold testified that she and the woman made eye contact as the woman drove away. Arnold called 911 and gave a description of the woman and the car and gave the tag number of the vehicle.[1] Arnold then waited for the police to arrive.

¶6.    The State showed Arnold several photographs, including a photo of the vehicle driven by the woman and the vehicle's license plate (JDM 592). Arnold identified the vehicle and the license plate as the ones involved in the armed robbery. A copy of the Dollar General surveillance video of the crime was presented, as was a recording of Arnold's 911 call; both were played for the jury.

¶7.    Arnold testified that she was shown a photo lineup three days after the robbery and she was 80 percent sure when she identified Smith. She explained in her trial testimony that

---

[1] Arnold told the 911 dispatcher that a woman robbed the store and left in a vehicle with a Jefferson Davis County tag with license plate number "JDM 529 or 592." Arnold testified that she is dyslexic, so she "always make[s] sure that if I think I have a number reversed, I give both numbers."

"I told Detective Sims, my gut instinct is 80 percent sure it was the defendant; 20 percent sure it was the other person." According to Arnold, the reason she did an eighty percent identification was that "[t]here was . . . another person in the lineup that had been in my store earlier that day that I went and did the police lineup. She's a regular customer, and . . . it threw me a little bit." At trial, Arnold identified Smith as the person who committed the armed robbery.

¶8.     James, the store cashier, also testified for the State. She corroborated Arnold's testimony about the woman looking for toothache medicine. James then testified that when the woman reached her cash register to check out, James rang up the medicine and told the woman her total. At that point, James said the woman came around the cash register and got behind her and said, "I have a gun. I have my kids in the car. Just give me a little bit of the money." James then testified that the woman also grabbed a pair of scissors from the counter and put them against James's back. At one point in the surveillance video, a pair of scissors can be seen hanging out of the woman's pocket. James told the woman that because she had already rung up the sale, the cash register could not be opened without the manager using her key to void the sale. The woman repeatedly told James to just hit the "enter" or "total" buttons to open the cash register; James hit the buttons, and the woman hit buttons herself, but the cash register would not open.

¶9.     In the meantime, other customers were waiting at the register to check out, and the woman walked from behind the counter and stood nearby. Arnold arrived and voided the sale, and James began ringing up the next customer. According to James, when the cash

4

register opened, the woman stuck her hand in the cash register drawer and said, "I'm sorry. Thank you." James said that the woman grabbed "a whole bunch of money, and we just started wrestling with her – me and my manager – out the door." At that point James's boyfriend emerged and assisted.

¶10.    James positively identified Smith as the robber in a photo lineup three days after the robbery. James also identified Smith as the robber in court. James gave police a description of the woman and said the woman was around 5' 2" tall, because she was taller than James, who is 4' 11" tall.

¶11.    Officer Eric Prouix testified that he was working on patrol for the Hattiesburg Police Department on June 5, 2013. He was dispatched to the Dollar General and preserved the register/counter area for potential fingerprints, if any could be found. He also helped secure the scene. Officer Prouix testified that no fingerprints were found.

¶12.    Officer Tammy Hoadley of the Hattiesburg Police Department testified that she was also working on patrol on the evening of June 5, 2013. She responded to a dispatch call around 8 p.m. regarding an armed robbery and reported to the Dollar General. When she got there, she helped secure the area and spoke with the victims, Arnold and James. Officer Hoadley testified that she did not collect any fingerprints and she did not transport anything to the crime lab for DNA analysis.[2]

¶13.    Detective Casey Sims worked for the Hattiesburg Police Department and investigated

---

[2] Detective Sims, the investigating officer, testified that the police recovered no fingerprints from the Dollar General store, and no DNA was recovered from the gray jacket. According to Detective Sims, the jacket was stored in a plastic bag which destroyed any possible DNA evidence.

the armed robbery at Dollar General that took place on June 5, 2013. Detective Sims testified that he ran the tag numbers that were reported, and he determined that the vehicle belonged to an elderly woman who lived out of town, a Ms. Bobbie Fairley. He testified that he asked Ms. Fairley to come to Hattiesburg on a pretense. He met with her, seized her vehicle, and processed the vehicle as a crime scene. Detective Sims further testified that during the course of his investigation he was able to determine the names of the people who were at Ms. Fairley's house on the evening of the robbery, which included Tameka Smith, who was Ms. Fairley's grandson's girlfriend. Detective Sims said he was informed that on June 5, 2013, Ms. Fairley's grandson took Smith's vehicle and left Smith and her two children with Ms. Fairley. Once Detective Sims ascertained that Smith had been at Ms. Fairley's home on the evening of the robbery, he brought Smith in for questioning.

¶14. Detective Sims testified that about three days after the robbery, he presented photo lineups to James and Arnold. Detective Sims corroborated Arnold's testimony that she circled Smith and another person; and Detective Sims likewise confirmed that James positively identified Smith in the photo lineup. Both Arnold and James identified Smith in court as the robber.

¶15. Detective Sims testified that he arrested Smith for armed robbery and that Smith's booking information reflects that she is 5' 7" tall and weighed 235 pounds. Detective Sims also obtained Smith's cell phone records, which were admitted as an exhibit at trial. The records showed that Smith made a call from around Prentiss, Mississippi, at 7 p.m. that lasted 582 seconds (9 minutes and 41 seconds). The records also reflected that Smith made a call

6

from around Prentiss at 8:43 p.m., which lasted 252 seconds (4 minutes and 12 seconds). Detective Sims testified that the call reporting the robbery came out "around 2000 hours, which is 8 p.m." The time stamp on the store's surveillance video indicates that the robbery occurred at about 7 p.m., or 19:00 hours. Arnold, the store manager, testified that the time on the surveillance video was an hour behind because the district manager was the only one who could adjust the system, and the district manager was on sick leave when the time changed, so the time had not been set forward. Detective Sims testified that the Prentiss area is about forty minutes from the Dollar General store.

¶16. Steve Pazos, an investigator with the District Attorney's office, testified that he conducted a follow-up investigation into the case. Specifically, Investigator Pazos testified that he interviewed Smith's mother and alibi witness, Jennifer Smith. According to Investigator Pazos, Jennifer said she was on the phone with her daughter during the time that the robbery took place because they spoke from 7:00 p.m. to 7:09 p.m. Investigator Pazos testified that his phone conversation with Jennifer discredited Smith's alibi that she was on the phone with her mother when the robbery took place because the actual call for service came in through the police department's line at 7:54 p.m. A recording of Investigator Pazos's interview with Jennifer was played for the jury and admitted into evidence.

¶17. Jennifer Smith testified for the defense. She testified that the suspect in the surveillance video was not her daughter because Smith was pigeon-toed, but the suspect was not; Smith's legs are straight, but the suspect's legs "bowed back"; the suspect was much wider than Smith; and the suspect's skin was darker than Smith's skin. Jennifer testified that

7

she was at her home in Pattison, Mississippi, on the night of the robbery, and she talked to Smith on the phone about a business-plan homework assignment from about 7:00 p.m. to 7:10 p.m. On cross-examination, Jennifer acknowledged that Smith was staying at Ms. Fairley's house in June 2013.

¶18. Smith testified in her own defense at trial. Smith testified that she was not the person in the surveillance video and that she never went to the Dollar General on the night in question. She said she got to Prentiss (Ms. Fairley's home) at about four o'clock that evening with her children, and immediately began to work on homework. She made a five-minute trip to a corner store right down the street just outside of Prentiss sometime between 7:30 p.m. and 8:30 p.m., and she left the house a second time with her boyfriend at about 10 p.m. They went to the Junior Food Mart in Prentiss. Smith denied ever going to Forrest County on the night in question. Smith testified that she is about 5' 7" tall and, under cross-examination, Smith testified that she weighed 205 pounds at trial, which was about thirty pounds less than she weighed in June 2013. At trial, Smith stood up and showed the jury that she was pigeon-toed. She denied that she was guilty of the robbery.

¶19. In response to questions by the prosecutor, Smith denied that she lived with her boyfriend's grandmother (Ms. Bobbie Fairley) in 2013, but she acknowledged that she visited for a couple of days and was staying the night at Bobbie Fairley's home on June 5, 2013. Smith acknowledged that Bobbie Fairley lived in Jefferson Davis County, and that Bobbie Fairley's car was the car police tracked down using the tag number at issue. Smith testified that Bobbie Fairley lay down in bed about 7 p.m. or 7:30 p.m. on the night in question, but

Smith testified that Bobbie Fairley was not asleep at that time. Smith also testified that Bobbie Fairley's car was not accessible to her because Bobbie Fairley kept her keys in her purse in the bedroom and usually locked the bedroom door. Smith acknowledged that Arnold reported the vehicle being driven by a person matching her general description, but she maintained that she never drove the vehicle that night or left Prentiss to go to Hattiesburg.

¶20. The jury was instructed on the offense of armed robbery, the lesser-included offense of simple robbery, and the alibi defense. The trial court denied Smith's requested instruction on misidentification. After retiring for deliberations, the jury returned a verdict, finding Smith guilty of armed robbery. Smith was sentenced to serve twenty years in MDOC custody, with twelve years to serve, eight years suspended, and five years of post-release supervision. Smith was also ordered to pay a $2,500 fine, $100 to the victim compensation fund, and all court costs. The sentencing order was entered August 13, 2015. Smith's trial counsel filed no post-trial motions. On September 3, 2015, Smith filed a notice of appeal, pro se. Smith was subsequently appointed appellate counsel through the Office of State Public Defender, Indigent Appeals Division, and an amended notice of appeal was filed on March 14, 2017.

## DISCUSSION

### I. *Batson* Challenge

¶21. Smith asserts that the State's use of three of five peremptory challenges against

African American jurors constitutes a violation of *Batson v. Kentucky*[3] because these jurors were not struck for race-neutral reasons. As addressed in more detail below, the trial court found that Smith did not meet her burden to go forward with a *Batson* challenge, and even if she had, the trial court found that the three African American jurors were struck for race-neutral reasons. Finding no error, we affirm the trial court's ruling on this issue.

¶22. The Mississippi Supreme Court has directed this Court to "'give great deference to a trial court's determinations under *Batson* because they are based largely on credibility.'" *Williams v. State*, 126 So. 3d 85, 94 (¶37) (Miss. Ct. App. 2013) (quoting *Flowers v. State*, 947 So. 2d 910, 917 (¶8) (Miss. 2007)). A *Batson* ruling may not be overturned unless the record indicates that the ruling "was clearly erroneous or against the overwhelming weight of the evidence." *Id.* (internal quotation mark omitted) (quoting *Thorson v. State*, 721 So. 2d 590, 593 (¶4) (Miss. 1998)).

¶23. As the Mississippi Supreme Court has explained, a *Batson* challenge should proceed as follows:

> First, the defendant must establish a prima facie case of discrimination in the selection of jury members. The prosecution then has the burden of stating a racially neutral reason for the challenged strike. If the State gives a racially neutral explanation, the defendant can rebut the explanation. Finally, the trial court must make a factual finding to determine if the prosecution engaged in purposeful discrimination. If the defendant fails to rebut, the trial judge must base his decision on the reasons given by the State.

*Berry v. State*, 802 So. 2d 1033, 1037 (¶11) (Miss. 2001).

¶24. In this case, after the trial court allowed two jurors to be struck for cause (Jurors 11

---

[3] *Batson v. Kentucky*, 476 U.S. 79 (1986).

10

and 19), the State submitted its first twelve jurors, going up through, and including, Juror 20. Juror 17 was absent. Out of the remaining seventeen panel members, the record reflects that the State exercised the first five of its six peremptory challenges, striking three African Americans and two Caucasians. At this point the defense raised its *Batson* challenge. Smith's initial *Batson* challenge was based on her trial counsel's mistaken belief that the State had used four (not three) of its peremptory challenges to strike African Americans, namely Jurors 9, 10, 12, and 13. The trial court corrected Smith's counsel, noting on the record that Juror 12 was a Caucasian female.

¶25. In response to Smith's *Batson* challenge, the trial court judge stated that he did not know whether Smith had met her burden of showing a prima facie case of discrimination in the selection process, given that three of the State's peremptory strikes were against African Americans, and two were against Caucasians. The trial court, however, allowed the State to go forward and provide its race-neutral reasons for its strikes.

¶26. The State provided the following explanations:

| Juror Number | State's reason(s) for exercising peremptory strike |
|---|---|
| Juror 9 | "[W]e observed that she seemed to be disinterested, was not making eye contact." |
| Juror 10 | "[I]t was our observation that she frowned a lot during our voir dire and gave us the impression that she just didn't want to be here." |
| Juror 13 | "[S]he also seemed to be disinterested and not really engaged in the voir dire process." |

The State also provided the reason it struck Juror 12 (a Caucasian female): "As to [Juror] number 12, she seemed not only disinterested, but also aggravated, at times with the entire

11

voir dire process." Lastly, the State pointed out that of the twelve jurors submitted by the State at that point, four were African Americans.

¶27. The trial court then afforded Smith an opportunity to rebut the State's race-neutral reasons. Smith's counsel offered the following rebuttal:

> Your Honor, the only thing that the State has proffered as a race-neutral reason is that they didn't want to be here. Nobody wants to be here, Your Honor. That's not a valid excuse or a reason to excuse somebody, and he said nothing else.

In response, the trial court held:

> I think he said more than simply they don't want to be here. And quite frankly, I disagree with you that nobody wants to be here. These are my people. They like to come to court.

> But in any event, I don't think you've met your burden to go forward with a *Batson* [c]hallenge. And in the event you have, I do not think that these jurors were -- well, I do think they were struck for race-neutral reasons.

In short, the only rebuttal offered by Smith was that "juror disinterest" was not a race-neutral reason because "nobody wants to be [on the jury panel]." The trial court rejected this argument based on its own experience and observation that "[t]hese are my people. They like to come to court."[4]

¶28. On appeal, Smith asserts that the State's reasons for excluding the jurors in question included several of the five indicators of pretext. The Mississippi Supreme Court has specified five indicia of pretext for use in analyzing a race-based *Batson* challenge:

> (1) disparate treatment, that is, the presence of unchallenged jurors of the

---

[4] We take judicial notice of the fact that at the time of trial, the trial court judge had served as a circuit court judge in Forrest County, Mississippi (Twelfth District) for over thirteen years; his observation in this regard is plainly entitled to deference.

12

opposite race who share the characteristic given as the basis for the challenge; (2) the failure to voir dire as to the characteristic cited; (3) the characteristic cited is unrelated to the facts of the case; (4) lack of record support for the stated reason; and (5) group-based traits.

*Lynch v. State*, 877 So. 2d 1254, 1272 (¶52) (Miss. 2004). Smith, as the opponent of the strikes at issue here, bears the burden in determining whether a race-neutral explanation is pretextual. *Id.* (citing *Berry*, 802 So. 2d at 1042 (¶29)). Smith's trial counsel, however, offered no evidence supporting his rebuttal argument that "nobody wants to be [on the jury panel];" nor did he address any of the above-cited indicators of pretext. As such, Smith is procedurally barred from raising this issue on appeal. *See Sudduth v. State*, 562 So. 2d 67, 71 (Miss. 1990) ("In the absence of an actual proffer of evidence by the defendant to rebut the State's neutral explanations, this Court may not reverse on this point.").

¶29. Procedural bar notwithstanding, we also reject Smith's *Batson* challenge on the merits. As an initial matter, we recognized that when a *Batson* challenge is appealed, "'[i]t is the responsibility of the appellant to furnish the court with a record which is adequate to review the issues presented.'" *Watson v. State*, 991 So. 2d 662, 665 (¶7) (Miss. Ct. App. 2008) (quoting *Ward v. State*, 958 So. 2d 1233, 1236 (¶9) (Miss. Ct. App. 2006) (citing *Williams v. State*, 522 So. 2d 201, 209 (Miss. 1988))). In *Watson*, we held that the trial court did not err in denying the defendant's *Batson* challenges. *Watson*, 991 So. 2d at 665 (¶7). We examined the record in reaching this conclusion, as follows:

> Nothing in the record suggests that race played a role in the arrest or prosecution of Watson. The race of the two arresting officers is not mentioned in the record. The record is quite sparse concerning the racial composition of the entire venire panel, which consisted of approximately fifty people. Of the seventeen members on the venire panel first considered for peremptory

13

challenges by the State for tendering to the defense, nine of those seventeen were African Americans. The State exercised five of its six available strikes. The State accepted and tendered four African American panel members even though it had one remaining peremptory strike. There is no indication in the record of the race of any of the six jurors peremptorily stricken by the defense. Likewise, there is no indication in the record of the race of the final juror excused by the State when it used its last peremptory strike. Needless to say, no information exists in the record to indicate the racial composition of the jury that actually tried Watson.

*Id.*

¶30. Just as we determined in *Watson*, we likewise find here no abuse of discretion in the trial court's *Batson* determination, as the record displays no racial discrimination in the jury selection in this case. In the Appendix to this opinion, we set forth the juror and jury selection information that this Court was able to glean from the record. From our review of the record, we find that it contains no information concerning the racial composition of the entire venire panel. As to the race of the seventeen members of the panel first considered for peremptory challenges by the State for tendering to the defense, the record indicates that the State exercised five of its six available strikes, striking three African Americans and two Caucasians. At this point, Smith's counsel made his *Batson* challenge. The record shows that at this time, the State had selected four African American panel members, although it had one remaining peremptory strike. The record contains no evidence of the race of any of the six jurors peremptorily struck by the defense; nor is there any indication of the race of the final juror struck by the State when in exercised its final peremptory challenge.

¶31. Having rejected the sole rebuttal argument offered by Smith, we find no abuse of discretion in the trial court's *Batson* decision herein based upon the race-neutral reasons

given by the State. *Thorson*, 721 So. 2d at 593 (¶2) ("If the defendant fails to rebut, the trial judge must base his decision on the reasons given by the State."); *see also Watson*, 991 So. 2d at 665 (¶8). The trial court determined that even if Smith had met her burden with proceeding with a *Batson* challenge, the three African American jurors at issue were struck for race-neutral reasons—juror disinterest and inattention. Precedent supports that juror disinterest and inattention are race-neutral reasons for a peremptory challenge. *See Horne v. State*, 825 So. 2d 627, 636 (¶24) (Miss. 2002) ("Inattentiveness alone has been accepted as a race-neutral explanation for the exercise of a peremptory strike."); *see also Berry*, 802 So. 2d at 1043 (¶36) ("This Court has held [that] '[i]nattentiveness, boredom, dress, demeanor, unemployment, and sleeping during voir dire have all been determined by this Court to be racially neutral reasons.'").

¶32. We also find no merit in the pretextual arguments that Smith asserts on appeal. Smith appears to be making a "disparate treatment" argument in asserting that it is "not sensible" for the trial court to have "assumed" that unchallenged Caucasian jurors were not "disinterested." Smith, however, points to no evidence in the record that indicates that selected Caucasian jurors showed disinterest. In fact, the record reflects that Juror 12, a Caucasian female, was *struck* by the State for the same reason, as follows: her disinterest and aggravation with the process as a whole. This supports a race-neutral reason for the State striking jurors on the basis of disinterest, rather than a purposefully racially discriminatory motive.

¶33. Smith also asserts that the race-neutral reasons provided by the State are "unrelated

to the facts of the case" and therefore indicate pretext. Relying upon precedent, we disagree. In *Lockett v. State*, for example, the Mississippi Supreme Court expressly recognized that "[a]n expression of contempt or hostility may reasonably be assumed to spell trouble for the prosecution. Such demeanor is a legitimate reason, *related to any case*, for a prosecutor to exercise a peremptory challenge." *Lockett v. State*, 517 So. 2d 1346, 1351-52 (Miss. 1987) (citing cases) (emphasis added). In the same way, we find that the demeanor of the three jurors in question is related to Smith's case, and does not constitute a pretextual basis for exercising a peremptory challenge.

¶34. Finally, Smith asserts that the fact that neither the prosecution nor the trial court judge questioned the three jurors regarding their demeanor and lack of interest indicates that these reasons were merely a pretext. Smith also argues that there is no record evidence that the three jurors in issue were disinterested or failed to make eye contact. We also reject these contentions. As we recognized in *Watson*, "although lack of support in the record may be an indication of pretext, 'the basis for the prosecutor's strike need not be in the record.'" *Watson*, 991 So. 2d at 665 (¶9) (quoting *Manning v. State*, 765 So. 2d 516, 520 (¶10) (Miss. 2000)). Moreover, "'a trial court's determination of whether or not a reason is race-neutral largely depends on the credibility of the prosecutor.'" *Manning*, 765 So. 2d at 520 (¶11) (quoting *Thorson*, 721 So. 2d at 597 (¶23)); *see Wilson v. State*, 72 So. 3d 1145, 1155 (¶¶28-29) (Miss. Ct. App. 2011).

¶35. In *Manning*, the Mississippi Supreme Court found it relevant that "[t]he demeanor of a potential juror would not be reflected in the record absent comment from counsel or the

16

trial judge, which did not occur in this case.  As a result, . . . the prosecutor's proffered reason is neither supported nor disproved by the record."  *Id.*  Under those circumstances, which are the same circumstances as in this case, the Court recognized that "[w]e have previously accepted a juror's demeanor as a valid race-neutral reason for a peremptory strike, and therefore give deference to the trial judge's acceptance of this race-neutral reason offered by the [prosecutor in this case]."  *Id.*  We apply this same reasoning here in rejecting Smith's pretextual contentions on the merits.[5]

¶36.    In light of the great deference given a trial court's determination on a *Batson* challenge, the applicable law, and the lack of evidence offered by Smith in support of her *Batson* challenge, we affirm the trial court's denial of Smith's *Batson* challenge in this case.

## II.    Prosecutorial Misconduct

¶37.    Smith asserts that the State committed prosecutorial misconduct in its closing arguments by allegedly (1) making burden-shifting arguments; and (2) commenting on Smith's failure to call Bobbie Fairley as a witness.  Bobbie Fairley was the grandmother of

---

[5] Smith relies on *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008), in arguing that the trial judge is required to make an on-the-record, independent finding on a juror's demeanor when a peremptory challenge is based on that factor.  In *Thaler v. Haynes*, 559 U.S. 43 (2010), however, the United States Supreme Court made clear that *Snyder* does not stand for that "categorical rule;" and there was no suggestion in *Snyder* or *Batson* that "in the absence of [the trial judge's] personal recollection of the juror's demeanor, the judge could not have accepted the prosecutor's explanation."  *Id.* at 48-49 (also recognizing that "the best evidence of the intent of the attorney exercising a strike is often that attorney's demeanor.").  In finding no abuse of discretion by the trial court here in his *Batson* ruling, we rely on these same principles which are also reflected in Mississippi precedent. *See, e.g.*, *Manning*, 765 So. 2d at 520 (¶¶10-11) (recognizing the great deference given a trial judge's race-neutral determination and assessment of the prosecutor's credibility on a *Batson* challenge); *Wilson*, 72 So. 3d at 1155 (¶¶28-29).

Smith's boyfriend at the time. Smith was visiting Bobbie Fairley's home in Prentiss, Mississippi, including spending the night at Bobbie Fairley's home on June 5, 2013—the evening of the robbery.

¶38. Where lawyer-misconduct during opening or closing arguments is alleged, the applicable standard of review requires the Court to determine "whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Terrell v. State*, 237 So. 3d 717 (¶92) (Miss. 2018).

### A. *Alleged Burden-shifting Arguments*

¶39. Smith takes issue with the prosecutor's comments in closing that "[t]he defense hasn't put on one shred of evidence contradicting the elements of . . . the crime . . . of armed robbery];" and his argument later in closing that Smith's testimony and theory of defense was "no proof at all." Smith also takes issue with the following portion of the State's closing argument:[6]

> That's all they've given you. *Not a shred of evidence to support their defense.* As jurors, you have to take the evidence, apply that evidence to the law. Remember we talked about letting sympathies slip into your process? Okay. Other types of factors. Things outside of looking at the evidence and applying it to the law. *I submit to you that if you do your duty as a juror*, if you focus not on all this nonsense but on the evidence, and you apply the evidence to the law, *you have to find her guilty 'cause there's nothing else to consider. Nothing has been provided to you by the Defense that would . . . .*

At this point during the argument, Smith's counsel objected, stating, "Your Honor, I would

---

[6] The portions of the prosecutor's arguments that Smith argues are objectionable are in italics.

object to this line. What he's saying is that the defense has a duty to do anything to present evidence. That is not the law, Your Honor." The trial court sustained the objection, instructing the defense to "stay away from that area [of argument]."

¶40. We acknowledge that "[t]he burden of proof in a criminal case never shifts from the State to the defendant." *Randall v. State*, 806 So. 2d 185, 211-12 (¶61) (Miss. 2001). In this case, however, reading the prosecutor's comments in "the context and circumstances of the case," as we must,[7] we find that the record reflects that the prosecutor was merely commenting on the inadequacy and weakness of Smith's defense. Precedent establishes that this is not error.[8] The Mississippi Supreme Court has specifically recognized that it is "clearly proper" for a prosecutor to comment on the weakness of a defendant's defense. *Holland v. State*, 705 So. 2d 307, 349 (¶179) (Miss. 1997). This Court likewise has determined that "it is not error to comment on the defense's failure to offer any evidence whatsoever to counter or explain the State's evidence." *Johnson v. State*, 89 So. 3d 630, 637 (¶23) (Miss. Ct. App. 2011). Nor is it "improper to argue in closing that a defendant's case is inadequate." *Huggins v. State*, 911 So. 2d 614, 619 (¶14) (Miss. Ct. App. 2005); *see Johnson*, 89 So. 3d at 637-38 (¶23); *Dora*, 986 So. 2d at 923 (¶12) (recognizing that the prosecution is permitted to comment on the absence of evidence to support defendant's defense and to point out that the defense's position (theory) is unsupported by the evidence).

¶41. As addressed above, the record shows that the prosecutor's comments did not

---

[7] *Johnson v. State*, 89 So. 3d 630, 637 (¶22) (Miss. Ct. App. 2011) (quoting *Sanders v. State*, 939 So. 2d 842, 846 (¶9) (Miss. Ct. App. 2006)).

[8] *See Dora v. State*, 986 So. 2d 917, 923 (¶¶12-13) (Miss. 2008).

19

constitute error and the trial court sustained the defendant's objection. Further, jurors are presumed to follow the court's instructions. *See Johnson v. State*, 475 So. 2d 1136, 1142 (Miss. 1985). In this case, the jury was properly instructed that their exclusive duty is to consider and weigh the evidence; that they must give Smith the benefit of any reasonable doubt; and that they could only find Smith guilty if the State proved all the elements of armed robbery beyond a reasonable doubt. Additionally, jury instruction D-3 addressed Smith's presumption of innocence, and the jury was also told that Smith was not required to establish the "truth of her alibi to [the jury's] satisfaction." In short, the State's comments on the inadequacy of Smith's defense did not shift the burden of proof, and, particularly in light of these jury instructions, we find that the natural and probable effect of the State's arguments did not create unjust prejudice against Smith. *See Johnson*, 89 So. 3d at 638 (¶¶22-24).[9]

Finding no error, this issue lacks merit.

### B. *Failure to Call Bobbie Fairley*

---

[9] Smith relies on *Randall v. State*, 806 So. 2d 185 (Miss. 2001) to support her burden-shifting argument. We first observe that even in *Randall*, a burden-shifting argument by the prosecutor was not found to be reversible error in and of itself, but rather the Court held that combined with other prosecutorial misconduct errors, the cumulative errors warranted reversal. *Id.* at 214 (¶74). In any event, *Randall* is also distinguishable because there the prosecutor told the jurors that "[t]*here is no evidence or exhibit that some other person did this* [i.e., kill the victim, Eugene Daniels]." *Id.* at 212 (¶64) (emphasis in original). The Mississippi Supreme Court held that this line of argument was error, specifically recognizing that the defendant, "Randall[,] had no burden to prove that the two unidentified men were the actual killers." *Id.* at 212 (¶66). No such burden-shifting argument was made in this case; there was no suggestion by the prosecutor that Smith was required to show that "some other person" committed the armed robbery. As addressed above, we find no error because it was not improper for the State to comment on the inadequacy of Smith's defense, and, further, the jury was amply instructed on the State's burden of proving its case beyond a reasonable doubt.

20

¶42. Smith also asserts that the State made an improper comment during its closing argument about her failure to call Bobbie Fairley as a witness to support Smith's alibi. The prosecutor said, "[Smith] doesn't have any evidence of alibi because she doesn't have an alibi. Ms. Bobbie Fairley – you know, she was staying at Ms. Bobbie Fairley's house, and she wasn't here to testify."

¶43. Smith's trial counsel objected to this comment and the trial court sustained the objection, admonishing the State to "[s]tick to the evidence that's been presented." Smith did not request a curative instruction, nor did Smith request a mistrial. As such, we reject Smith's assignment of error on this issue based upon the Mississippi Supreme Court's determination on similar grounds in *Walker v. State*, 671 So. 2d 581, 616 (Miss. 1995).

¶44. In *Walker*, the defendant asserted on appeal that he was deprived of a fair trial based upon a number of incidences of alleged prosecutorial misconduct. In one instance, Walker's counsel objected to the prosecutor's remarks regarding stipulations made throughout trial, and the trial court instructed the prosecutor not to "raise a comment on why the stipulations were made. . . . Proceed." *Walker*, 671 So. 2d at 616. Walker's counsel did not seek a curative instruction, nor did he seek a mistrial. *Id.* The Court held that "[b]ecause the trial court admonished the prosecutor in response to Walker's objection, effectively sustaining the objection, and because Walker requested no further action, this assignment of error is rejected." *Id.*[10] We find the same analysis applies here. Not only did Smith's trial counsel

---

[10] *See also Foster v. State*, 639 So. 2d 1263, 1282 (Miss. 1994) ("Foster [the defendant] neither requested that the trial court admonish the jury to disregard the testimony [regarding bad acts by Foster], nor requested a mistrial. His only objection was sustained. We are of the opinion that any error created by Harris's unresponsive remark was effectively

fail to request a curative instruction or a mistrial, but he also filed no post-trial motion in which this objection could have been raised. We reject Smith's assignment of error regarding the State's reference to her failure to call Bobbie Fairley on this basis.

¶45. We also reject this assignment of error on the merits. "Mississippi caselaw recognizes that, generally, it is improper to comment on the failure of either party to call a witness equally accessible to both parties." *Lathan v. State*, 164 So. 3d 484, 488 (¶16) (Miss. Ct. App. 2014) (internal quotation mark omitted). However, an exception exists to this general rule, as follows:

> [T]he rule barring comment [does] not apply where a witness, while technically accessible to both parties, stood more available to the complaining party. Where a defendant fails to call a witness more available to him and presumptively in a closer relationship with him, the state is fully entitled to comment on the party's failure to call the witness.

*Wallace v. State*, 229 So. 3d 723, 726 (¶16) (Miss. Ct. App. 2017) (quoting *Ross v. State*, 603 So. 2d 857, 864 (Miss. 1992)). Additionally, the State is allowed to comment on the evidence and point out that the defense's theory is unsupported by the evidence. *Dora*, 986 So. 2d at 923 (¶¶12-13).

¶46. In this case, Bobbie Fairley was more accessible to Smith than to the State because Smith was presumptively in a closer relationship to Bobbie Fairley. As noted above, Bobbie Fairley was the grandmother of Smith's boyfriend, and Smith was spending the night at Bobbie Fairley's home on the night of the robbery, working on homework except for a five-minute trip to the corner store and, later that evening, a short trip to the Junior Food Mart in

cured when the trial judge sustained Foster's objection.").

22

Prentiss. It was not improper for the State to comment on Bobbie Fairley's absence for this reason. *See Wallace*, 229 So. 3d at 726 (¶16) (no error for State to comment on defendant's failure to call his friend as a witness); *see also Ross*, 603 So. 2d at 864 (no error for prosecutor to refer to defendant's failure to call his brother as a witness); *Pearson v. State*, 64 So. 3d 569, 576 (¶24) (Miss. Ct. App. 2011) ("Based on Pearson's testimony that he was at home with his wife at the time the sale took place, we find the State was permitted to delve into whether Pearson intended to call his wife to verify his alibi."). Further, it was also permissible for the State to comment on the lack of evidence supporting Smith's alibi defense due to Ms. Fairley's absence. *Dora*, 986 So. 2d at 923 (¶¶12-13). We find this assignment of error without merit for these reasons.

### III. Sixth Amendment Right to Confrontation

¶47. Smith claims that her Sixth Amendment Confrontation Clause[11] right to confront adverse witnesses was violated when the State's witness, Detective Sims, testified that through his questioning of Bobbie Fairley and her grandson, he was informed that Smith was at Ms. Fairley's house on the night of the robbery; and that the grandson took Smith's car, leaving Smith at Ms. Fairley's house with no vehicle except Ms. Fairley's car, which was used in the robbery. "The standard of review for the admission or suppression of evidence is abuse of discretion." *Fullilove v. State*, 101 So. 3d 669, 674 (¶16) (Miss. Ct. App. 2012).

¶48. Smith acknowledges that although her trial counsel objected to Detective Sims's testimony on the basis of "lack of foundation," he did not object to it on the basis that it was

---

[11] U.S. Const. amend. VI; Miss. Const. art. 3, § 26.

testimonial hearsay in violation of her rights under the Confrontation Clause. "The assertion on appeal of grounds for an objection which was not the assertion at trial is not an issue properly preserved on appeal." *Smith v. State*, 925 So. 2d 825, 835 (¶26) (Miss. 2006) (quoting *Haddox v. State*, 636 So. 2d 1229, 1240 (Miss. 1994)).

¶49. Smith's failure to make a contemporaneous Sixth Amendment objection requires that she rely on the plain error doctrine. *Fullilove*, 101 So. 3d at 675 (¶21); *Foster*, 639 So. 2d at 1289 ("[A] defendant who fails to make a contemporaneous objection must rely on plain error to raise the assignment on appeal."). "Under the plain-error doctrine, 'we can recognize obvious error which was not properly raised by the defendant on appeal, and which affects a defendant's fundamental, substantive right.'" *Fullilove*, 101 So. 3d at 675 (¶21) (internal quotation mark omitted) (quoting *Neal v. State*, 15 So. 3d 388, 403 (¶32) (Miss. 2009)).

¶50. It is well-established that "only testimonial hearsay is capable of violating the Sixth Amendment." *Neal*, 15 So. 3d at 403 (¶34) (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)). As such, we must first examine whether the challenged testimony constitutes hearsay by determining "the purpose for admitting the testimony into evidence and review its relevance." *Fullilove*, 101 So. 3d at 675 (¶18) (citing M.R.E. 401 & 402).

¶51. Mississippi Rule of Evidence 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." We find that Detective Sims's testimony did not constitute hearsay. In *Fullilove*, we concluded that an investigating officer's testimony was not hearsay where he stated that another officer had identified three men, including the defendant

24

Fullilove, on a store surveillance tape. *Fullilove*, 101 So. 3d at 674-76 (¶¶15-21). The Court found that the testimony showed the investigator's reasons for proceeding to interrogate Fullilove, and was not admitted for the purpose of proving the truth of the other officer's assertion as to his alleged identification of Fullilove on the tape. *Id.* at 675-76 (¶¶20-21).

¶52. In applying precedent to this case, similar circumstances lead us to the same conclusion here. The State claims, and the record supports, that the information from Ms. Fairley and her grandson referenced by Detective Sims was given to Detective Sims during the course of his investigation. The record further indicates that this information was presented to the jury to explain Detective Sims's course of investigation and the reason he brought Smith in for questioning. "Statements do not constitute hearsay when admitted to explain an officer's course of investigation or motivation for the next investigatory step by that officer." *Fullilove*, 101 So. 3d at 675 (¶20); *see also Birkley v. State*, 203 So. 3d 689, 696 (¶16) (Miss. Ct. App. 2016); *Jefferson v. State*, 214 So. 3d 1071, 1078 (¶19) (Miss. Ct. App. 2016) ("An officer's testimony being offered to explain why he or she acted as he or she did, and not for the truth of the matter asserted, is not hearsay and is admissible."). In this regard, "[o]ut-of-court statements made to police during the course of their investigations are admissible." *Fullilove*, 101 So. 3d at 675 (¶20).

¶53. Based on precedent, the record reflects that had a hearsay/confrontation clause objection been made, the trial court would not have abused its discretion in overruling that objection and allowing admission of Detective Sims's testimony for the following purpose served here: explaining Detective Sims's course of investigation and the reason he proceeded

25

to bring Smith in for questioning. In short, Detective Sims's testimony was relevant and related to his decisionmaking in his investigatory process. The jury was not exposed to inadmissible hearsay, and Smith's rights under the Confrontation Clause were not implicated. Smith has not met her burden of showing that admission of this testimony violated a fundamental, substantial right. We therefore find that the admission of Detective Sims's testimony was not plain error. *See Fullilove*, 101 So. 3d at 674-76 (¶¶15-21); *Neal*, 15 So. 3d at 404 (¶36) (determining that investigator's testimony regarding information learned from a neighbor was admitted to explain Investigator's decision to proceed in his investigation; it therefore was not hearsay in violation of the Confrontation Clause and thus the plain error doctrine was not implicated).

### IV. Jury Instruction on Misidentification Defense

¶54. Smith asserts that one of her defenses was misidentification, and thus the trial court erred in failing to give her proffered identification jury instruction D-9. The standard of review for the giving or refusing of jury instructions is abuse of discretion. *Victory v. State*, 83 So. 3d 370, 373 (¶12) (Miss. 2012). In undertaking this review, "[n]o one instruction should be singled out." *Id*. Instead, the Court will "review[] the jury instructions as a whole to determine whether an error has occurred." *Id.* Although a defendant is entitled to present his theory of the case through jury instructions, he is not entitled to an instruction "[that] incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Harris v. State*, 861 So. 2d 1003, 1012-13 (¶18) (Miss. 2003). "There is no error if all instructions taken as a whole fairly, but not necessarily perfectly,

26

announce the applicable rules of law." *Newell v. State*, 49 So. 3d 66, 73-74 (¶18) (Miss. 2010).

¶55.    It is well-established under Mississippi law that "the trial court is required to provide [an identification] instruction when 'the identification of the accused rests entirely upon the testimony of a single witness.'" *Taylor v. State*, 109 So. 3d 589, 595 (¶20) (Miss. Ct. App. 2013) (quoting *Tugle v. State*, 68 So. 3d 691, 696 (¶21) (Miss. Ct. App. 2010)). A defendant, however, "is only entitled to such an instruction if requested and if he is identified as the guilty party by, at most, one witness to his alleged crime." *Id.*; *see Warren v. State*, 709 So. 2d 415, 421 (¶28) (Miss. 1998). That is not the situation here. Although Smith requested an identification instruction in this case, Smith was identified as the guilty party by *two* witnesses. Under the precedent discussed above, Smith was not, therefore, entitled to an identification instruction, and the trial court did not err in refusing to give it.

¶56.    Smith argues, however, that there was really only one eyewitness-identification in her case because only the store cashier, Kelly James, identified Smith as the robber in a photo line-up. Store manager, Paige Arnold, identified two women in a photo lineup, and testified at trial that she told the investigating officer that she was eighty percent sure that one woman was the robber (Smith) and twenty percent sure it was the other person. Arnold also testified at trial that the reason she was unsure was that the other person in the photo lineup was a regular customer, and that is what confused her. At trial both James and Arnold identified Smith in court as the robber.

¶57.    We addressed nearly identical circumstances in *Tugle*, and found that the trial court

27

did not err in refusing an identification instruction, as follows:

> Although it is true that William and Brassel failed to correctly identify [the defendant] prior to trial, they did in fact testify that Tugle was the individual who had attempted to arm rob them. Further, through cross-examination, the jury was made aware of William's pretrial misidentification. As such, we find that the trial court did not err in refusing jury instruction D-2. This issue lacks merit.

*Tugle*, 68 So. 3d at 696 (¶22). The same analysis applies here. Similar to the witnesses in *Tugle*, Arnold was only eighty percent sure Smith was the robber in the photo line-up, but she did, in fact, positively identify Smith at trial. The jury also heard about Arnold's pre-trial misidentification and the reason for her confusion. Further, this case is even stronger than *Tugle*, because James, the cashier, positively identified Smith in both the photo-line-up and at trial. As we held in *Tugle*, we also find here that the trial court did not abuse its discretion in refusing the identification jury instruction in this case.

¶58.     Additionally, in addressing jury instructions dealing with eyewitness identification, the Mississippi Supreme Court, and this Court, repeatedly recognize that "'the general instruction given to the jury to the effect that the State has the burden of proving each element of the offense charged beyond a reasonable doubt,' includes the misidentification issue." *Smith v. State*, 802 So. 2d 82, 88 (¶20) (Miss. 2001) (quoting *Robinson v. State*, 473 So. 2d 957, 963 (Miss.1985)); *see, e.g.*, *Taylor*, 109 So. 3d at 595 (¶20); *Brunner v. State*, 37 So. 3d 645, 649-50 (¶¶15-18) (Miss. Ct. App. 2009).

¶59.     The jury instructions given in this case included the misidentification/identification issue. The record reflects that instructions C-2, S-1, and D-3, instructed the jury that the State had to prove beyond a reasonable doubt that on June 5, 2013, Tameka Smith committed

the elements of armed robbery. Instruction D-6 informed the jury, in part, "[y]ou have the duty to determine the believability of the witnesses. In performing this duty, you must consider each witness's intelligence, the witness's ability to observe and accurately remember the witness's sincerity, and the witness's demeanor while testifying."

¶60. Defense counsel's proffered identification jury instruction D-9, which the trial court refused, provided as follows:

> The Court instructs the Jury that in reaching your verdict you are to consider all of the evidence concerning the entire case and the circumstances surrounding the crime. One of the issues in this case is the identification of Tameka Marquieta Smith as the perpetrator of the crime. As with each element of the crime charged, the State has the burden of proving identity beyond a reasonable doubt, and before you may convict Tameka Marquieta Smith you must be satisfied beyond a reasonable doubt of the accuracy of the identification of Tameka Marquieta Smith. If, after considering all of the evidence concerning the crime and the witness' identification of Tameka Marquieta Smith as the person who committed the crime, you are not convinced beyond a reasonable doubt that she is the person who committed the crime, then you must find her not guilty.
> 1) Did the witness have an adequate opportunity to observe the offender?
> 2) Did the witness observe the offender with an adequate degree of attention?
> 3) Did the witness provide an accurate description of the offender after the crime?
> 4) How certain is the witness of the identification?
> 5) How much time passed between the crime and the identification?
> If after examining all of the testimony and the evidence, you have a reasonable doubt that Tameka Smith was the person who committed the crime, then you must find Tameka Smith not guilty.

In reading the jury instructions as a whole, as we must,[12] we find no error in the trial court's refusal of the identification jury instruction proffered by the defense. As detailed above, the

___

[12] *Victory v. State*, 83 So. 3d 370, 373 (¶12) (Miss. 2012).

29

instructions given encompassed the misidentification issue. They addressed the State's burden of proving that Tameka Smith was the robber beyond a reasonable doubt, and instruction D-6 explicitly warned the jurors that they have the duty to determine the believability of the witnesses. Smith's assignment of error regarding the trial court's refusal of her identification jury instruction is without merit for this additional reason. *See Taylor*, 109 So. 3d at 596 (¶23); *Brunner*, 37 So. 3d at 650 (¶18).

## V.     Error in Allowing Exhibits with Notations on the Envelopes

¶61.    The State introduced three CD/DVD exhibits at trial. These exhibits were admitted into evidence and played for the jury without objection. Each CD/DVD was in an envelope, and these envelopes had notations on them regarding the recordings. Smith asserts that the trial court erred when it allegedly allowed the jury to have the CD/DVD exhibits in these envelopes because, according to Smith, the notations on the envelopes were argumentative comments; they highlighted specific portions of the evidence; and the jury could have believed the notations were made by the trial court judge. The standard of review for a trial court's rulings "regarding matters of evidence, relevancy and discovery violations, . . . is abuse of discretion." *Montgomery v. State*, 891 So. 2d 179, 182 (¶6) (Miss. 2004). We find this assignment of error without merit for the following reasons.

¶62.    The record contains the original CD/DVD exhibits in the envelopes containing the following notations:

30

| Exhibit description | Notation description |
|---|---|
| Ex. 5 - surveillance video from Dollar General | 5:23 P. Arnold enters video<br>6:28 ▲'s face is exposed<br>It appears that ▲ had a pair of scissors in her pocket<br>▲ went for the cash drawer<br>use Quicktime player |
| Ex. 6 - 911 recording | Play this one<br>* 06-05-13 19.56.05 911 call from manager<br>manager gave dispatch ▲'s license plate #.<br>you can hear the panic in her voice.<br>Use Windows media player |
| Ex. 9 - the recorded phone conversation between Investigator Pazos and Jennifer Smith | Play Track 1 using Windows media player<br>"7:00-7:09 on phone"<br>(AR occurred at 8:00) |

¶63.   Smith claims that these exhibits, in their envelopes, were given to the jury.  Even if they were, the record contains no contemporaneous objection from Smith's trial counsel regarding the envelopes and the notations they contained.  Further, Smith's trial counsel did not file any post-trial motions, and thus this alleged error was never raised until Smith's appeal.  Accordingly, even assuming the exhibits were given to the jury in their envelopes, we find that this issue is procedurally barred. As the Mississippi appellate courts repeatedly recognize, "[i]t is incumbent on the party asserting error to make a contemporaneous objection and obtain a ruling in order to preserve the objection." *Ronk v. State*, 172 So. 3d 1112, 1128 (¶29) (Miss. 2015); *see, e.g.*, *Terrell v. State*, 952 So. 2d 998, 1003 (¶17) (Miss. Ct. App. 2006).  Smith did not do so.

¶64.   Procedural bar notwithstanding, we also find that Smith's argument is without merit.

31

Although the record reflects that the recordings were admitted into evidence, there is no indication in the record that the envelopes, containing the notations, were entered into evidence. There also is no indication in the record that the jury was given these exhibits in the envelopes. Even assuming this did occur, Smith acknowledges that "the comments on the envelopes in this case were almost certainly made by investigators or a member of [the] prosecution team;" yet Smith then speculates that there exists the possibility that one or more of the jurors could have believed the comments were made by the trial court.

¶65. We acknowledge the principle that judges "should be astutely careful so that unintentionally the jurors are not improperly influenced by their words and actions," *Wilson v. State*, 451 So. 2d 724, 726 (Miss. 1984), but there is simply no evidence that this took place here. The record contains no indication at all that the trial judge made the notations, endorsed the notations, or that the judge even knew the notations were on the envelopes. In this regard, "[i]t is elementary that a party seeking reversal of the judgment of a trial court must present this Court with a record adequate to show that an error of reversible proportions has been committed and that the point has been procedurally preserved." *Hansen v. State*, 592 So. 2d 114, 127 (Miss. 1991) (quoting *Queen v. Queen*, 551 So. 2d 197, 199 (Miss. 1989)). Further, "[t]his Court must decide each case by the facts shown in the record, not assertions in the brief." *Id.* (internal quotation marks omitted). Under these guiding principles, we find this assignment of error without merit because it is wholly unsubstantiated in the record.

¶66. **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, FAIR, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR. WILSON, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**

**JUROR AND JURY SELECTION INFORMATION**
**ON FIRST TWENTY PANEL MEMBERS**

| Juror # | State | Defense |
|---|---|---|
| 1 | submitted | accepted |
| 2 | submitted | accepted |
| 3 | struck by peremptory challenge | |
| 4 | submitted | struck by peremptory challenge |
| 5 | submitted | struck by peremptory challenge |
| 6 | submitted | struck by peremptory challenge |
| 7 | submitted | struck by peremptory challenge |
| 8 | submitted | accepted |
| 9 (African American) | struck by peremptory challenge | |
| 10 (African American) | struck by peremptory challenge | |
| 11 | struck for cause without objection by defense | |
| 12 (Caucasian) | struck by peremptory challenge | |
| 13(African American)[13] | struck by peremptory challenge | |
| 14 | submitted | accepted |

---

[13] Smith's trial counsel made his *Batson* challenge after the State exercised its fifth peremptory challenge against Juror 13. During argument on Smith's *Batson* challenge, the State pointed out that of the 12 jurors submitted by the State at that point in the jury selection process, four were African Americans. The trial court also observed that at this point in the jury selection process, three of the State's peremptory strikes were against African Americans, and two were against Caucasians.

| 15 | submitted | accepted |
|---|---|---|
| 16 | submitted | struck by peremptory challenge |
| 17 - Juror was absent | | |
| 18 | submitted | struck by peremptory challenge |
| 19 | struck for cause without objection by defense | |
| 20 | submitted | |